# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

BAILEY v SCHAAF

Docket No. 144055. Argued March 5, 2013 (Calendar No. 4). Decided July 30, 2013.

Devon S. Bailey brought an action in the Genesee Circuit Court against Steven G. Schaaf, T.J. Realty, Inc., doing business as Hi-Tech Protection, Evergreen Regency Townhomes, Ltd., Radney Management & Investments, and others for injuries suffered on August 4, 2006 while at a friend's apartment in a complex owned and operated by Radney. In 2003, Radney entered into a contract with Hi-Tech to provide Evergreen with security personnel to patrol the premises and a new contract was negotiated in the summer of 2006, with an effective date of August 28, 2006. Hi-Tech security guards William Baker and Chris Campbell were on duty and patrolling the complex on the night Bailey was injured. A resident had informed Baker and Campbell that Schaaf was threatening people with a gun at an outdoor gathering. Bailey alleged that Baker and Campbell ignored the warning. Sometime later they heard two gun shots; Schaaf shot Bailey twice in the back, rendering Bailey a paraplegic. Bailey alleged that Baker and Campbell were agents of Hi-Tech, and that Hi-Tech was an agent of Radney and Evergreen. Bailey asserted multiple claims against all defendants under theories of premises liability, negligent hiring and supervising, ordinary negligence, vicarious liability, and breach of contract. The court, Joseph J. Farah, J., granted partial summary disposition to defendants and Bailey appealed. The Court of Appeals, BECKERING, P.J., and WHITBECK and M. J. KELLY, JJ., affirmed in part and reversed in part the circuit court's order. 293 Mich App 611. The Court of Appeals concluded in part that Evergreen and Radney owed Bailey a duty to call the police in response to an ongoing situation on the premises, extending the Supreme Court's decision in *MacDonald v PKT, Inc*, 464 Mich 322, 338; 628 NW2d 33 (2001) to the landlord-tenant context. In addition the Court of Appeals rejected Bailey's argument that he was a third-party beneficiary of the provision-of-security contract between Hi-Tech and Evergreen and that Hi-Tech did not owe Bailey a duty that was separate and distinct from Hi-Tech's duties under the original 2003 contract between Hi-Tech and Evergreen that was in effect at the time of Bailey's injuries. The Supreme Court granted defendants' application for leave to appeal and the parties were asked to address whether the Court of Appeals erred when it extended the *MacDonald* holding to the landlord-tenant context. Bailey's application for leave to cross-appeal remained pending. 491 Mich 924 (2012).

In an opinion by Chief Justice YOUNG, joined by Justices KELLY, ZAHRA, MCCORMACK, and VIVIANO, the Supreme Court *held*:

Consistent with the limited duty of care recognized in *MacDonald* as applying to the merchant-invitee relationship, landlords have a duty to reasonably expedite police involvement when put on notice of criminal acts occurring in common areas that pose a risk of imminent and foreseeable harm to an identifiable tenant or invitee.

1. The common law imposes a duty of care when a special relationship exists, which is predicated on an imbalance of control. Michigan law has recognized that a special relationship exists between owners and occupiers of land and their invitees, including between a landlord and its tenants and their invitees and between a merchant and its invitees. The common law establishes that a landlord and merchant have coextensive duties to protect invitees and tenants from physical hazards on the premises. The element of control is essential in establishing a landlord or merchant's duty over the premises. Where tenants, their invitees, or a merchant's invitees lack control over certain premises, the landlord or merchant bears the burden of control and has the duty to keep such areas reasonably safe. Like the duty owed by merchants to their invitees as articulated in *MacDonald*, a landlord owes a duty to respond when put on notice of a risk of imminent harm to an identifiable tenant or invitee in the common areas of the landlord's premises. If and when this duty is triggered, the duty only requires a landlord to reasonably expedite police involvement. The duty is imposed on the landlord only when given notice to such a situation that is occurring in an area within its control; the landlord does not have a duty to respond to criminal acts occurring within the leasehold of the tenant.

2. In this case, the Court of Appeals properly held that defendants were not entitled to summary disposition under MCR 2.11(C)(8) because, accepting Bailey's allegation as true, defendants had a duty to reasonably expedite the involvement of the police. Bailey also alleged sufficient facts involving the existence of a contract for security services between the security company and the landlord. The facts alleged would establish an agency relationship, imputing to the landlord Green's notice to Baker and Campbell of the ongoing situation and placing defendants on notice that their invitees and tenants faced a specific and imminent harm.

3. The case is remanded to the Court of Appeals for consideration of Evergreen and Radney's vicarious liability issues under *Al-Shimmari v Detroit Medical Ctr*, 477 Mich 280; 731 NW2d 29 (2007), including whether the issues were properly preserved. With regard to Bailey's application for leave to appeal as cross-appellant, part V(E) of the Court of Appeals judgment, which upheld the trial court's dismissal of Bailey's negligence claims against Hi-Tech on the basis of the contract between Hi-Tech and Evergreen, is vacated and the case was remanded to the Court of Appeals for reconsideration of that issue in light of *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157; 809 NW2d 553 (2011) and *Hill v Sears, Roebuck & Co*, 492 Mich 651; 822 NW2d 190 (2012). Bailey's application for leave to appeal as cross-appellant is denied in all other respects.

Court of Appeals judgment affirmed in part, vacated in part, and the case remanded to the Court of Appeals for further proceedings consistent with the opinion.

Justice MCCORMACK, concurring, agreed that the landlord-tenant relationship is a special relationship and that the security guards breached a duty to Bailey by failing to alert law enforcement when notified of the possibility of imminent danger. The landlord-tenant

relationship is a special relationship; as a result, the law imposes a duty on landlords to protect tenants from certain risks. Moreover, this relationship involves a voluntary market exchange. Because the costs of maintaining security are ultimately passed off to tenants, the question of how much security a landlord should provide is a question for the markets to decide.

Justice CAVANAGH, concurring in part and dissenting in part, agreed that the minimal duty that *MacDonald* imposed on merchants should be applied to landlords on the basis of the landlord-tenant relationship. Landlords share a special relationship with their tenants and invitees, which implicates a landlord's duty to protect against the conduct of third parties that pose an imminent and foreseeable risk of harm within the common areas of the premises. Unlike the majority's conclusion that the common law has recognized the landlord-tenant special relationship within the context of imposing a duty to protect another from third-party conduct, imposition of the duty is justified by analyzing the nature of the landlord-tenant relationship, which is the critical factor to be considered when imposing a duty to protect another. Michigan's caselaw regarding a merchant's duty to protect its invitees from the conduct of a third party has either been silent or expressly declined to opine as to whether a landlord has a similar duty to protect its tenants and invitees.

Justice MARKMAN, dissenting, would have held that under the common law there is no legal duty to aid or protect another from third-party criminal conduct unless a "special relationship" exists in which a person can be said to have entrusted himself to the control and protection of another person with a consequent loss of control to protect himself. The majority failed to satisfy its burden of demonstrating compelling reason for why Michigan's common law, which has not recognized a landlord-tenant special relationship establishing a legal duty to aid or protect, should be altered to further apportion among those who have perpetrated *no* criminal conduct, legal responsibility for the harms caused by those who *have* perpetrated criminal conduct. Justice MARKMAN would continue to adhere to the common-law rule that it is the criminal perpetrator who is legally and exclusively responsible for the harms caused by his or her criminal conduct.

©2013 State of Michigan

# Opinion

Chief Justice:          Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
                        Stephen J. Markman
                        Mary Beth Kelly
                        Brian K. Zahra
                        Bridget M. McCormack
                        David F. Viviano

FILED JULY 30, 2013

STATE OF MICHIGAN

SUPREME COURT

DEVON SCOTT BAILEY,

        Plaintiff-Appellee/
        Cross-Appellant,

v                              No. 144055

STEVEN GEROME SCHAAF,

        Defendant,
and

T.J. REALTY, INC., d/b/a HI-TECH
PROTECTION, TIMOTHY JOHNSON,
CAPTAIN WILLIAM BOYD BAKER,
CHRISTOPHER LEE CAMPBELL,

        Defendants-Appellees,

and

EVERGREEN REGENCY TOWNHOMES,
LTD., and RADNEY MANAGEMENT &
INVESTMENTS,

        Defendants-Appellants/Cross-
        Appellees.

BEFORE THE ENTIRE BENCH

YOUNG, C.J.

Our common law has long imposed the same duty of care on landlords and merchants to remedy physical defects in premises over which they exert control. This consistency is premised on the similar degree of control both landlords and merchants exercise over the premises. Where third parties commit criminal acts against tenants and invitees in these controlled areas, landlords and merchants share a similar, albeit lesser, degree of control because of the inherent unpredictability of criminal conduct. Such unpredictability requires the imposition of a duty concomitant with the decreased amount of control. In *MacDonald v PKT, Inc*,[1] we held that Michigan law imposes a duty on a merchant only when the merchant has notice that a third party's criminal acts pose a risk of imminent and foreseeable harm to an identifiable invitee. In such a situation, the merchant's duty to that invitee is limited to reasonably expediting involvement of the police. Recognizing that landlords and merchants exert similar degrees of control over their premises, and cognizant of our historical and consistent treatment of their duty to remedy physical defects, today we make clear that landlords owe the same limited duty of care when put on notice of criminal acts that pose a risk of imminent and foreseeable harm to an identifiable tenant or invitee—a duty to reasonably expedite police involvement.

In this case, because the plaintiff alleged that the landlord's agents were informed of an imminent threat of criminal conduct against him and the landlord failed to contact

---

[1] *MacDonald v PKT, Inc*, 464 Mich 322, 338; 628 NW2d 33 (2001).

the police after such notice, we affirm the judgment of the Court of Appeals in part and remand to the Court of Appeals for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Evergreen Regency Townhomes, LTD (Evergreen) is located in Flint, Michigan, and is owned and operated by Radney Management & Investments, Inc. (Radney). In 2003, Radney entered into a contract with Hi-Tech Protection (Hi-Tech) to provide Evergreen with security personnel to patrol the premises.[2] In the summer of 2006, Radney and Hi-Tech negotiated a new contract with an effective date of August 28, 2006.

On August 4, 2006, plaintiff, Devon Bailey, attended an outdoor social gathering in the common area of Evergreen's apartment complex, where Hi-Tech's security guards William Baker and Christopher Campbell were patrolling the premises in a golf cart. At one point during the social event, Evergreen resident Laura Green informed the security guards that defendant Steven Schaaf was brandishing a revolver and threatening to kill someone. The security guards did not respond. Sometime after Green informed the security guards of Schaaf's behavior, the security guards heard two gunshots. Schaaf had shot plaintiff twice in his back, rendering plaintiff a paraplegic.

Plaintiff filed a civil suit against Schaaf,[3] Evergreen, Radney, and Hi-Tech, its owner, and the two security guards on duty at the time of the incident. Plaintiff alleged

---

[2] T.J. Realty, Inc. conducted business under the assumed name of Hi-Tech. Timothy Johnson is the President of Hi-Tech and the owner of T.J. Realty, Inc.

[3] Schaaf pleaded *nolo contendere* to various criminal charges and is currently incarcerated. In the instant civil action against defendant Schaaf, the trial court entered a default judgment against Schaaf; as a result, his civil liability is not currently at issue.

3

that the security guards, Baker and Campbell, were agents of Hi-Tech, and that Hi-Tech was an agent of Radney and Evergreen. Plaintiff asserted multiple claims against defendants on the basis of various theories of liability, including premises liability, negligent hiring and supervising, ordinary negligence, vicarious liability, and breach of contract. Defendants filed a motion for partial summary disposition under MCR 2.116(C)(8), arguing that no defendant owed plaintiff any duty. Plaintiff also filed a motion for partial summary disposition under MCR 2.116(C)(10), asserting that as a matter of law defendants Radney, Evergreen, and Hi-Tech owed plaintiff a duty on the basis of the contract to provide security services. The Genesee Circuit Court granted defendants' motion and denied plaintiff's motion, which resulted in the dismissal of plaintiff's claims.

The Court of Appeals affirmed in part and reversed in part the trial court's order.[4] Regarding plaintiff's premises liability claim against defendants Evergreen and Radney, the Court of Appeals held that defendants owed plaintiff a duty to call the police in response to an ongoing situation on the premises, extending this Court's decision in *MacDonald* to the landlord-tenant context.[5] However, the Court of Appeals rejected plaintiff's argument that he was a third-party beneficiary of the provision-of-security contract between Hi-Tech and Evergreen, holding that the parties' contract on which plaintiff relied—which had an effective date of August 28, 2006—was not in effect on

---

[4] *Bailey v Schaaf*, 293 Mich App 611; 810 NW2d 641 (2011)

[5] *Id.* at 640-642.

4

August 4, 2006, at the time of plaintiff's injuries.[6]  Finally, the Court of Appeals, applying *Fultz v Union-Commerce Assoc*,[7] held that Hi-Tech did not owe plaintiff a duty that was separate and distinct from Hi-Tech's duties under the original 2003 contract between Hi-Tech and Evergreen that was in effect at the time of plaintiff's injuries.[8]

Defendants Radney and Evergreen filed an application for leave to appeal in this Court, arguing that the Court of Appeals erred by extending *MacDonald* to the landlord-tenant context, or, alternatively, that defendants were not vicariously liable for the security guards' negligence because the security guards were not their agents.  Moreover, even if the security guards were defendants' agents, defendants argue that they could not be liable as principals under *Al-Shimmari v Detroit Medical Center*.[9]  Plaintiff also sought leave to cross-appeal the Court of Appeals' holdings regarding plaintiff's claims that he was a third-party beneficiary of the contract between Evergreen and Hi-Tech, and that Hi-Tech owed plaintiff a duty that was separate and distinct from its contractual obligations to Evergreen.

We granted defendants' application for leave to appeal and asked the parties to address

---

[6] *Id*. at 625-626.

[7] *Fultz v Union-Commerce Assoc*, 470 Mich 460; 683 NW2d 587 (2004).  After *Bailey* was submitted to the Court of Appeals, but before that Court issued its decision in the case, this Court clarified *Fultz*.  See *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157; 809 NW2d 553 (2011); *Hill v Sears, Roebuck & Co*, 492 Mich 651; 822 NW2d 190 (2012).

[8] *Bailey*, 293 Mich App at 642-643.

[9] *Al-Shimmari v Detroit Med Ctr*, 477 Mich 280; 731 NW2d 29 (2007).

whether the Court of Appeals erred when it extended the limited duty of merchants—to involve the police when a situation on the premises poses an imminent risk of harm to identifiable invitees, see [*MacDonald*, 464 Mich at 322]—to landlords and other premises proprietors, such as the defendant apartment complex and property management company.[10]

## II. STANDARD OF REVIEW

A motion for summary disposition under MCR 2.116(C)(8) tests the legal sufficiency of the claim on the basis of the pleadings alone and the ruling is reviewed de novo.[11] "The motion must be granted if no factual development could justify the plaintiff's claim for relief."[12] When deciding a motion under MCR 2.116(C)(8), the court must accept as true all factual allegations contained in the complaint.[13] Whether a defendant owes a particular plaintiff a duty is a question of law that this Court reviews de novo.[14] "Only after finding that a duty exists may the factfinder determine whether, in light of the particular facts of the case, there was a breach of the duty."[15] While ordinarily a jury determines what constitutes the breach of a duty to provide reasonable care under the circumstances, "in cases in which overriding public policy concerns arise, the court determines what constitutes reasonable care."[16]

---

[10] *Bailey v Schaaf*, 491 Mich 924 (2012). Plaintiff's application for leave to appeal as cross-appellant remained pending. *Id.*

[11] *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998).

[12] *Id.*

[13] *Simko v Blake*, 448 Mich 648, 654; 532 NW2d 842 (1995).

[14] *Loweke*, 489 Mich at 162.

[15] *Murdock v Higgins*, 454 Mich 46, 53; 559 NW2d 639 (1997).

[16] *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 500-501; 418 NW2d 381

### III.  HISTORY OF COMMON LAW DUTY OF LANDLORDS AND MERCHANTS TO REMEDY PHYSICAL DEFECTS IN AREAS UNDER THEIR CONTROL

It is a basic principle of negligence law that, as a general rule, "there is no duty that obligates one person to aid or protect another."[17]  However, our common law imposes a duty of care when a special relationship exists.[18]  These special relationships are predicated on an imbalance of *control*, where "one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself."[19]  Michigan law has recognized that a special relationship exists between "[o]wners and occupiers of land [and] their invitees," including between a landlord and its tenants and their invitees and between a merchant and its invitees.[20]

The law of torts has historically conditioned the special relationship on the control that a possessor of premises—whether landlord or merchant—exerts over the premises.  As a result, the law of torts has treated landlords and merchants the same in the context of their duties to maintain the physical premises over which they exercise control.  In the

---

(1988); *MacDonald*, 464 Mich at 336.

[17] *Williams*, 429 Mich at 498-499; *Hargreaves v Deacon*, 25 Mich 1, 4 (1872) ("[W]here injury arises to a person from the neglect of one, in doing his lawful business in a lawful way, to provide against accident, the question arises at once whether he was under any legal obligation to look out for the protection of that particular person under those particular circumstances.  For the law does not require such vigilance in all cases, or on behalf of all persons."), abrogated on other grounds, *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 599; 614 NW2d 88 (2000)

[18] *Williams*, 429 Mich at 499.

[19] *Id.*

[20] *Id.* at 499-500.

landlord-tenant context, Justice COOLEY's seminal treatise on torts provides that, "[i]n case of office and apartment buildings the landlord must exercise due care to keep the halls, stairs, passageways, and like appurtenances reasonably safe for the tenants and their families and servants and for those who come to visit or transact business with them."[21] Professors Prosser and Keeton confirm the same and, moreover, recognize that landlords are "closely analogous" to merchants because they both have a duty to keep reasonably safe from physical hazard areas over which they exert control.[22]

This state's common law has likewise historically recognized the congruence between a landlord's and a merchant's duties of care concerning the physical maintenance of premises over which they exercise control. This Court has consistently imposed on both landlords and merchants a duty of care to keep the premises within their control reasonably safe from physical hazard. In *Butler v Watson*, a poorly attached post situated on the rear porch of a residential apartment building fell and struck a small child.[23] When considering the duties that a residential landlord owes to his tenants and their guests, this Court reasoned that a landlord owes a duty to its tenants and "all those who were approaching or leaving their premises for legitimate purposes" to "exercise reasonable diligence to keep such common portions of the property in a reasonably safe

---

[21] 3 Cooley, A Treatise on the Law of Torts (4th ed), p 219.

[22] Prosser & Keeton, Torts (5th ed), § 63, p 440.

[23] *Butler v Watson*, 193 Mich 322, 323-324; 159 NW 507 (1916). The child was a guest of her grandparents who were tenants in the apartment building.

condition . . . ."[24]  This Court imposed the duty because of the control that the landlord continued to exercise over the common portion of the property:

> [I]n such circumstances[,] the landlord not having let the common portion of the property to any one tenant, he has reserved the control thereof to himself.  Having thus reserved control, it is his duty to exercise ordinary care for the safety of those about the same, other than trespassers, or mere licensees.[25]

Thus, the landlord owed his tenants and their guests the duty to repair and make reasonably safe the porch upon which plaintiff was injured because it was a common area used by all the tenants and its control was reserved to the landlord.

Similarly, in *Goodman v Theatre Parking, Inc*, a man exited his car in defendant's parking lot and stepped on a cinder, spraining his ankle.[26]  This Court recognized that a merchant owed its invitees a "duty to maintain its premises in a reasonably safe condition in view of the contemplated use thereof and the purposes for which the invitation has been extended," and held that the defendant was obligated to keep the surface of its lot in a safe condition so that its patrons would not be harmed in entering or leaving the parking lot.[27]  Similarly, this Court's caselaw has consistently established that a merchant's duty of reasonable care over the physical premises does not extend to open and obvious

---

[24] *Id.* at 327-328, quoting *Herdt v Koenig*, 137 Mo App 589; 119 SW 56 (1909) (quotation marks omitted).

[25] *Butler*, 193 Mich at 327 (quotation marks and citation omitted).

[26] *Goodman v Theatre Parking, Inc*, 286 Mich 80, 81; 281 NW 545 (1938).

[27] *Id.* at 81-82. Nevertheless, this Court held that the plaintiff was ultimately barred from recovery because of his contributory negligence in failing to avoid the hazard.  *Id.* at 83.

physical hazards because of an invitee's coexisting ability to take reasonable measures to avoid such hazards.[28]

*Siegel v Detroit City Ice & Fuel Co* provides strong common-law support for concluding that a landlord and merchant have coextensive duties to protect invitees and tenants from physical hazards on the premises.[29] There, two defendants—the commercial owner of a parking lot and the merchant theater that leased the parking lot from the owner—were both held liable for an invitee's injury that arose from a hazard on the parking lot. After getting out of his car on his way to the theater, the plaintiff fell in a large oblong hole in the parking lot, injuring his femur. This Court explained that, because both the owner/landlord and the merchant/tenant shared control of the property due to the "joint right of ingress and egress," they both owed a duty of care to invitees on the property.[30] Recognizing that "[t]his is not a case where either the tenant or the landlord had exclusive control and possession of common passageways," the Court's

---

[28] Although *Goodman* negated the merchant's liability on the basis of the plaintiff's contributory negligence, our subsequent caselaw has clarified that the *scope* of a premises possessor's duty "does not generally encompass removal of open and obvious dangers." *Lugo v Ameritech Corp, Inc*, 464 Mich 512, 516; 629 NW2d 384 (2001). Specifically, *Lugo* held that "the open and obvious doctrine should not be viewed as some type of 'exception' to the duty generally owed invitees, but rather as an integral part of the definition of that duty." *Id.* See also *Hoffner v Goodman*, 492 Mich 450, 460-461; 821 NW2d 88 (2012) (citation omitted) ("The possessor of land 'owes no duty to protect or warn' of dangers that are open and obvious because such dangers, by their nature, apprise an invitee of the potential hazard, which the invitee may then take reasonable measures to avoid.").

[29] *Siegel v Detroit City Ice & Fuel, Co*, 324 Mich 205, 214; 36 NW2d 719 (1949).

[30] *Id.* at 213-214.

decision turned on the fact that "defendants each had possession and control" of the premises.[31]  Notably, this Court did not establish that different duties existed for the owner/landlord and the merchant/tenant.

Providing further support for this principle is our opinion in *Lipsitz v Schechter*, which continued to recognize that a landlord owes a duty to its residential tenants and their invitees to keep areas under its control reasonably safe from physical hazards.[32]  For that legal proposition, the Court cited both *Butler*, a case involving a landlord's responsibilities for its residential common area, and *Siegel*, involving as defendants both a commercial landlord and its tenant/merchant.  *Lipsitz* itself involved a tenant who was walking outside her 4-story apartment building and was struck by a screen window that fell from the building.  The Court reaffirmed that "the element of control is of prime importance" when determining the existence of a duty.[33]  Because the defendant landlord admitted that he had secured a screen window that had fallen from the building and that the landlord's janitor occasionally removed the screens to wash them, the Court concluded that the landlord exercised control over the screen and was consequently under an obligation to remedy any defect with regard to the screen that constituted a hazard.[34]

---

[31] *Id.* at 214.

[32] *Lipsitz v Schechter*, 377 Mich 685, 687; 142 NW2d 1 (1966).

[33] *Id.* at 687.

[34] *Id.* at 689.

These cases illustrate the consistency of our treatment of landlords and merchants as it pertains to the physical maintenance of the areas over which they retain control. Whether someone who controls a premises is a landlord or a merchant, the element of control forms the basis of imposing a duty to invitees. As illustrated in *Butler*, where "the landlord not having let the common portion of the property to any one tenant, he has reserved the control thereof to himself."[35] Thus, where tenants, their invitees, or a merchant's invitees lack control over certain premises, the concomitant actor in the special relationship—the landlord or merchant—bears the burden of control and thus the duty keep such areas reasonably safe.[36]

## IV. LIABILITY FOR THE CRIMINAL ACTS OF OTHERS

Traditionally, the duty imposed on a landlord or merchant had been limited to protect tenants and other invitees from physical defects in the property over which they retained control, not to protect tenants and other invitees from the criminal acts of others in those controlled areas.[37] However, in a series of cases dating from the 1970s, this

---

[35] *Butler*, 193 Mich at 327 (quotation marks and citation omitted).

[36] Of course, a landlord's duty does not extend to the areas within a tenant's leasehold, because the landlord has relinquished its control over that area to the tenant. See *Williams*, 429 Mich at 499 n 10; *Lipsitz*, 377 Mich at 687 ("The lessor, absent agreement to the contrary, surrenders possession and holds only a reversionary interest. Under such circumstances, he is under no obligation to look after or keep in repair premises over which he has no control."); Prosser & Keeton, Torts (4th ed.), § 63, pp 399-400. This relinquishment of control extinguishes the landlord's duty of reasonable care over those areas.

[37] Prosser & Keeton, Torts (5th ed), § 63, p 442 ("Prior to 1970, there was no general tort duty on landlords to protect their tenants against criminal theft or attack."); *Goldberg v*

12

Court expanded the duty of both landlords and merchants to protect their tenants and invitees from those criminal acts. The first case to do so, *Manuel v Weitzman*, held that a bar owner may be liable in common law negligence for failing to "take action to protect [the plaintiff] from injury" by another patron when the defendant knew that the other patron "had engaged in a fight in a bar at some time before the attack," when "the bartenders on duty did not take sufficient measures to eject him after he became obstreperous and disruptive," and when "the bartenders did not act immediately to protect [the plaintiff] from injury" once the initial assault began.[38] In doing so, this Court included for the first time the criminal acts of others being among the hazards within the scope of a merchant's duty "'to its customers and patrons, including the plaintiff, of maintaining its premises in a reasonably safe condition and of exercising due care to prevent and to obviate the existence of a situation, known to it or that should have been known, that might result in injury.'"[39]

---

*Housing Auth of City of Newark*, 38 NJ 578, 587; 186 A2d 291 (1962) ("The duty to provide police protection is foreign to the history of the landlord-tenant relationship."). Nationally, that duty began to expand in the context of the landlord-tenant relationship with *Kline v 1500 Mass Ave Apartment Corp*, 439 F2d 477, 481 (CA DC, 1970) ("[W]here, as here, the landlord has notice of repeated criminal assaults and robberies, has notice that these crimes occurred in the portion of the premises exclusively within his control, has every reason to expect like crimes to happen again, and has the exclusive power to take preventive action, it does not seem unfair to place upon the landlord a duty to take those steps which are within his power to minimize the predictable risk to his tenants.").

[38] *Manuel v Weitzman*, 386 Mich 157, 166-167; 191 NW2d 474 (1971), overruled in part on other grounds *Brewer v Payless Station, Inc*, 412 Mich 673; 316 NW2d 702 (1982).

[39] *Id.* at 163, quoting *Torma v Montgomery Ward & Co*, 336 Mich 468, 476; 58 NW2d

Similarly, in *Samson v Saginaw Professional Building, Inc*, this Court applied the same theory of liability to a commercial landlord that leased office space to an outpatient mental health clinic but that had failed "to provide some security measures or warnings for the safety of its tenants and visitors . . . ."[40] Although this case implied some duty for a landlord or merchant to take prophylactic measures to prevent third parties' criminal acts *before* they are imminent,[41] it did not specifically articulate the measures that a landlord or merchant must take to obviate the hazard of third parties' criminal acts. Indeed, a vigorous dissent in *Samson* questioned the imposition of such an amorphous duty.[42]

---

149.   Notably, *Torma* involved a merchant's duty to clear a physical defect on the property, and thus typified the traditional understanding of premises liability discussed above.

[40] *Samson v Saginaw Prof Bldg, Inc*, 393 Mich 393, 408-409; 224 NW2d 843 (1975).

[41] See *id*. at 411 (LEVIN, J., dissenting) ("[W]hen the landlord is informed by his tenants that a possible dangerous condition exists in the building, he has a duty to investigate and take available preventative measures."); *Manuel*, 386 Mich at 164, quoting *Windorski v Doyle*, 219 Minn 402, 407; 18 NW2d 142 (1945) ("'The proprietor of such a place has the undoubted right to exclude therefrom drunken and disorderly persons, and the right to remove and expel them when they become in that condition and disorderly, and likely to produce discord and brawls.  Being clothed with such power and authority, a corresponding duty to do so in the interests of law and order, and for the protection of his other guests, should be imposed as a matter of law.'").

[42] *Samson*, 393 Mich at 421 (LEVIN, J., dissenting) ("No line is discernible to distinguish the liability sought to be imposed on [the defendant] from potential liability of landlords who rent to psychiatrists or lawyers who see persons with violent or criminal backgrounds.").

Because "'any legal standard must, in theory, be capable of being known,'"[43] this Court has since clarified the scope of the duty to prevent harm arising out of third parties' criminal acts. In *Williams v Cunningham Drug Stores, Inc*, this Court held that "a merchant's duty of reasonable care does not include providing armed, visible security guards to deter criminal acts of third parties."[44] In doing so, this Court described the unpredictability of crime as the basis for limiting a merchant's liability toward invitees:

> [A]lthough defendant can control the condition of its premises by correcting physical defects that may result in injuries to its invitees, it cannot control the incidence of crime in the community. Today a crime may be committed anywhere and at any time. To require defendant to provide armed, visible security guards to protect invitees from criminal acts in a place of business open to the general public would require defendant to provide a safer environment on its premises than its invitees would encounter in the community at large. Defendant simply does not have that degree of control and is not an insurer of the safety of its invitees.[45]

---

[43] *Williams*, 429 Mich at 503 n 18, quoting Holmes, The Common Law, Lecture III (1923), p 111.

[44] *Williams*, 429 Mich at 501. Although *Williams* stated in dicta that a landlord has more control in his relationship with his tenants than does a merchant in his relationship with his invitees, *id.* at 502 n 17, we note that our common law has historically treated the duties of landlords and merchants similarly. Nevertheless, it is notable that, in making this distinction, *Williams* refused to apply *Samson* to the merchant-invitee special relationship.

[45] *Id*. at 502. This Court has recognized that cases involving the duties of merchants regarding criminal activity on their premises have a bearing on the similar duties of landlords. After *Williams*, we remanded to the Court of Appeals a case that involved whether a *residential landlord* had a duty to provide security guards, for reconsideration in light of *Williams*, which held that a *merchant* had no duty to provide security guards. *Bryant v Brannen*, 431 Mich 865; 428 NW2d 346 (1988); on remand 180 Mich App 87; 446 NW2d 847 (1989).

15

In *Scott v Harper Recreation, Inc*, this Court reiterated the proposition that a merchant "ordinarily has no obligation to provide security guards or to protect customers against crimes committed by third persons" and explained that this principle remains in force "even where a merchant voluntarily takes safety precautions,"[46] such as hiring security guards or installing additional lighting. Accordingly, a merchant's undertaking of measures to *deter* the crimes of others does not create a duty to *eliminate* those crimes. Indeed, the Court recognized that the alternative rule would create a disincentive for security measures.[47] In *Mason v Royal Dequindre, Inc*, this Court clarified that "merchants have a duty to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties."[48] However, beyond indicating that a merchant's actions "must be reasonable," the Court did not articulate the scope of the merchant's duty.

We finally did so in *MacDonald*, holding that "the duty to respond is limited to reasonably expediting the involvement of the police and that there is no duty to otherwise anticipate and prevent the criminal acts of third parties."[49] As in *Williams*, we explained

---

[46] *Scott v Harper Recreation, Inc*, 444 Mich 441, 451, 452; 506 NW2d 857 (1993).

[47] *Id*. at 451 ("[W]e decline to adopt a theory of law under which a merchant would be effectively obliged *not* to take such measures."). The Court also cited *Lee v Borman's, Inc*, 188 Mich App 665; 478 NW2d 653 (1991), and *Theis v Abduloor*, 174 Mich App 247; 435 NW2d 440 (1988), for the proposition that "providing a measure of security does not oblige a merchant to continue the practice." *Scott*, 444 Mich at 451 n 14.

[48] *Mason v Royal Dequindre, Inc*, 455 Mich 391, 405; 566 NW2d 199 (1997).

[49] *MacDonald*, 464 Mich at 326.

16

that, "[b]ecause criminal activity is irrational and unpredictable, it is in this sense invariably foreseeable everywhere."[50] As a result, "it is unjustifiable to make merchants, who not only have much less experience than the police in dealing with criminal activity but are also without a community deputation to do so, effectively vicariously liable for the criminal acts of third parties."[51] Although the element of control is essential in establishing a landlord or merchant's duty over the premises, they "do not have effective control over situations involving spontaneous and sudden incidents of criminal activity. On the contrary, control is precisely what has been lost in such a situation."[52]

In sum, *MacDonald* clarified the scope of a merchant's limited duty regarding the criminal acts of third parties:

> [G]enerally merchants "have a duty to use reasonable care to protect their identifiable invitees from the foreseeable criminal acts of third parties." The duty is triggered by specific acts occurring on the premises that pose a risk of imminent and foreseeable harm to an identifiable invitee. Whether an invitee is readily identifiable as being foreseeably endangered is a question for the factfinder if reasonable minds could differ on this point. While a merchant is required to take reasonable measures in response to an ongoing situation that is taking place on the premises, there is no obligation to otherwise anticipate the criminal acts of third parties. Consistent with *Williams*, a merchant is not obligated to do anything more than reasonably expedite the involvement of the police. We also reaffirm that a merchant is not required to provide security guards or otherwise resort to self-help in order to deter or quell such occurrences.[53]

---

[50] *Id*. at 335.

[51] *Id*.

[52] *Id*. at 337.

[53] *Id*. at 338, quoting *Mason*, 455 Mich at 405 (citations omitted).

While this duty has remained in place for merchants since clarified in *MacDonald*, we have not explicitly articulated the scope of the duty with regard to residential or commercial landlords. We do so today.

## V. THE SCOPE OF A LANDLORD'S DUTY

In keeping with the traditional common-law understanding that landlords and merchants share a similar level of control over common areas that are open to their tenants and other invitees, and thus assume the same duty of reasonable care with regard to those common areas, we hold that a landlord's duty regarding criminal acts of third parties is limited to and coextensive with the duty articulated in *MacDonald*. Thus, a landlord has a duty to respond by reasonably expediting police involvement where it is given notice of a "specific situation occur[ring] on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee."[54]

Like a merchant, a landlord can presume that tenants and their invitees will obey the criminal law.[55] Because of the unpredictability and irrationality of criminal activity, "[t]his assumption should continue until a specific situation occurs on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable [tenant or] invitee."[56] Only when given notice of such a situation is a duty imposed on a landlord. *Notice* is critical to determination whether a landlord's duty is triggered;

---

[54] *MacDonald*, 464 Mich at 335.

[55] *Id.*; see also *People v Stone*, 463 Mich 558, 565; 621 NW2d 702 (2001) (noting that an individual person can presume that others will obey criminal laws).

[56] *MacDonald*, 464 Mich at 335.

without notice that alerts the landlord to a risk of imminent harm, it may continue to presume that individuals on the premises will not violate the criminal law. To the extent this holding, and the holdings of *MacDonald* and *Williams*, conflict with *Samson* we limit *Samson* to the duty clarified today and in *MacDonald* and *Williams*.[57]

We wish to make clear, however, that just as a landlord does not owe a duty of repair within a tenant's leasehold,[58] a landlord likewise does not have a duty to respond to criminal acts occurring within the leasehold of a tenant. In both situations, the landlord has surrendered possession and control of the leasehold to the tenant.[59] Because our common law has consistently imposed a duty only where a landlord or merchant

---

[57] We do not address the status of *Johnston v Harris*, 387 Mich 569; 198 NW2d 409 (1972), because it is not implicated under the facts of this case. In *Johnston*, the plaintiff was attacked in the unlocked and poorly lit vestibule of his apartment by a man who was lurking there. He alleged that the defendant landlord was liable for his injuries because of inadequate lighting in the vestibule and unlocked doors. *Johnston* held that the landlord's duty to repair physical defects in common areas applies to "provid[ing] adequate lighting and locks." *Id.* at 573. *Johnston* should be read in light of *Scott*, however, which reaffirmed *Williams*' principle that we impose no liability on premises owners for the failure of *voluntary safety precautions*. In short, there is a duty imposed on merchants or landlords to repair defects on the premises, but there is no duty to provide extraordinary safety precautions like security guards or extensive lighting. See *Williams*, 429 Mich at 502; *Scott*, 444 Mich at 452; *Stanley v Town Square Coop*, 203 Mich App 143, 150-151; 512 NW2d 51 (1993) (holding that a premises owner has a duty to remedy a condition on the physical premises that creates "an unusual risk of criminal attack," but no duty to protect from the general hazard of crime which is "inherent in the society in which we live").

[58] See n 38.

[59] See *Williams*, 429 Mich at 499 n 10; *Lipsitz*, 377 Mich at 687; Prosser, Torts (4th ed.), pp 399-400.

19

exercises control over particular premises, a landlord's duty arises only when the triggering conduct occurs in those areas under the landlord's control.

If and when a landlord's duty is triggered, a reasonable response by the landlord is required. Typically, whether an actor proceeded reasonably is a question for the fact-finder. But, just as in *MacDonald*[60] and *Williams*,[61] we determine as a matter of law what constitutes reasonable care when a landlord is confronted with imminent criminal acts occurring on the premises under the landlord's control. And, like *MacDonald*, we make clear that as a matter of law, the duty to respond requires only that a landlord make reasonable efforts to expedite police involvement. Landlords, like merchants, have a low degree of control over the criminal acts of others. Our conclusion today does not expand a landlord's duty concerning third-party criminal acts; requiring more of a landlord than taking reasonable efforts to expedite police involvement would essentially result in the duty to provide police protection, a concept this Court has repeatedly rejected.[62] Consistent with our recognition that the duty to provide police protection is vested with the government, and given the unpredictability of specific acts of crime, we decline to impose any greater obligation on a landlord.

---

[60] *MacDonald*, 464 Mich at 336.

[61] *Williams*, 429 Mich at 501.

[62] See, e.g., *MacDonald*, 464 Mich at 336-337; *Williams*, 429 Mich at 501.

20

## VI. APPLICATION

Plaintiff's amended complaint alleges that plaintiff was attending a barbeque in a "common outdoor area" at Evergreen's apartment complex, where his brother was a tenant. Plaintiff alleges that during the barbeque, Schaaf entered the premises with a handgun and made threats "to kill somebody." Further, it is alleged that Laura Green, a tenant, informed the security guards, who were approximately 30 feet away from Schaaf, that "Schaaf was a non-resident, wielding a gun, [and] making threats to shoot people." It is also alleged that Green "pointed at Schaaf, identifying him" to security guards Baker and Campbell. Importantly, plaintiff alleges that the security guards failed to "notif[y] any police authorities of Schaaf's dangerous presence," even though Schaaf was "plainly observable in the immediate vicinity."

We have no doubt that plaintiff alleges sufficient facts that, if accepted as true, justify imposing a duty on defendants to notify police of the ongoing situation that was taking place at Evergreen. As the Court of Appeals accurately explained, plaintiff alleges facts indicating "the extreme nature of the ongoing situation at Evergreen," which involved "the most deadly circumstance of all" in the common area of the apartment complex: "a man brandishing a gun—apparently in full view of two security guards—who threatened to fire, and ultimately did fire, that gun with near fatal consequences."[63] The Court of Appeals also noted that in his complaint, plaintiff characterizes the alleged relationship between the security guards and the landlord as an agency "for purposes of

---

[63] *Bailey*, 293 Mich App at 627-628.

responding to safety issues."[64] Given the facts alleged involving the contract for security services between the security company and the landlord, we agree with the Court of Appeals that plaintiff has alleged sufficient facts that would impute to the landlord Green's notice to Baker and Campbell of the ongoing situation involving Schaaf in a common area of the premises. As a result, defendants were on notice that their invitees and tenants faced a specific and imminent harm. Furthermore, plaintiff was an identifiable victim of that harm because he was within the range of the risk of harm created by Schaaf's conduct.[65] Thus, if we accept plaintiff's allegations as true, defendants had a duty to reasonably expedite the involvement of the police, and the Court of Appeals properly held that the defendants were not entitled to summary disposition under MCR 2.116(C)(8).

## VII. CONCLUSION

In line with our consistent historical treatment of merchants and landlords in the context of their duty with regard to hazards in areas under their control, we apply the *MacDonald* framework to situations involving the landlord-tenant special relationship and, thereby, render consistent our treatment of landlords' and merchants' duties when faced with imminent criminal action. Because the plaintiff alleged that defendant's hired

---

[64] *Id.* at 641. Notably, "Green testified at her deposition that management had instructed the residents to call security to report any crimes." *Id*. at 641 n 82.

[65] See *MacDonald*, 464 Mich at 334.

22

security guards failed to contact the police when clearly on notice of an imminent risk to him, we affirm this part of the Court of Appeals judgment.

However, we remand this case to the Court of Appeals for its consideration of Evergreen's and Radney's vicarious liability issues under *Al-Shimmari*,[66] including whether the issues were properly preserved for appeal. Finally, as to plaintiff's application for leave to appeal as cross-appellant, we vacate part V(E) of the Court of Appeals judgment,[67] which upheld the trial court's dismissal of plaintiff's negligence claims against defendant Hi-Tech on the basis of the contract between Hi-Tech and Evergreen because it applied *Fultz*,[68] without discussing our clarification of *Fultz* in *Loweke*.[69] We remand this case to the Court of Appeals for reconsideration of that issue in light of *Loweke* and *Hill*.[70] The application for leave to appeal as cross-appellant is denied in all other respects because we are not persuaded that the remaining question presented should be reviewed by this Court.

> Robert P. Young, Jr.
> Mary Beth Kelly
> Brian K. Zahra
> Bridget M. McCormack
> David F. Viviano

---

[66] *Al-Shimmari*, 477 Mich at 280.

[67] *Bailey*, 293 Mich App at 642-643.

[68] *Fultz*, 470 Mich at 460.

[69] *Loweke*, 489 Mich at 157.

[70] *Hill*, 492 Mich at 651.

S T A T E  O F  M I C H I G A N

SUPREME COURT

DEVON SCOTT BAILEY,

      Plaintiff-Appellee/
      Cross-Appellant,

v

No. 144055

STEVEN GEROME SCHAAF,
      Defendant

and

T.J. REALTY, INC., d/b/a HI-TECH
PROTECTION, TIMOTHY JOHNSON,
CAPTAIN WILLIAM BOYD BAKER,
CHRISTOPHER LEE CAMPBELL

      Defendant-Appellees

and

EVERGREEN REGENCY TOWNHOMES,
LTD., and RADNEY MANAGEMENT &
INVESTMENTS,

      Defendant-Appellants/Cross-
      Appellees.

_____

McCormack, J. (*concurring*).

I agree with the majority's analysis and join its opinion without qualification. I write separately only to emphasize one point in the majority's fine opinion. It is sometimes useful for courts to emphasize that common sense, as well as precedent, recommends a particular course of action.

The majority rightly shows how this Court's past precedent establishes that plaintiff states a valid claim against defendants. The principles of *MacDonald v PKT, Inc*,[1] *Williams v Cunningham Drug Stores, Inc*,[2] and the other cases the majority identifies plainly govern here. The landlord-tenant relationship is an archetypal special relationship—the law imposes a duty on a landlord to protect tenants from certain risks.[3]

Landlords and tenants are bound by a voluntary market relationship, where money is exchanged for the promise of shelter. Here, defendants Evergreen and Radney hired security guards for a practical purpose[4]—to provide some measure of protection for tenants and their social guests. Undoubtedly, the presence of those security guards gave some amount of comfort to Evergreen's residents, and made Evergreen a more attractive place to live. Of course, the overhead costs of employing security staff are borne by Evergreen and Radney and passed on to the Evergreen tenants like the other costs of any amenity, which is to say that the market will tend to provide such services only when they are needed or desired. The dissent's suggestion to the contrary notwithstanding, the

---

[1] *MacDonald v PKT, Inc*, 464 Mich 322; 628 NW2d 33 (2001).

[2] *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495; 418 NW2d 381 (1988).

[3] See *id.* at 502 n 17.

[4] I recognize that the agency relationship between defendants Evergreen and Radney and Hi-Tech is an issue that is being remanded to the Court of Appeals for consideration, as there is some evidence to suggest that a contractual relationship may not have existed at the time of Bailey's injury. Contract or not, Hi-Tech was present on the premises not out of a selfless desire to do good; the security guards were there at Evergreen and Radney's invitation.

question of how much security, amongst other amenities, an apartment complex should provide is one for the market to determine, not this Court.

But the security guards' failure to alert law enforcement when notified of the possibility of imminent danger is a failure the law recognizes. It constitutes a violation of the defendants' duty because the resulting harm is foreseeable. Indeed, under the facts of this case, Hi-Tech's security guards are in the best position to reduce the risk of harm presented by Schaaf. In other words, the security guards were the cheapest cost-avoiders of the harms that Bailey suffered.[5] The defendants face liability because the harm in question was foreseeable, and the security guards failed to do their job.

Bridget M. McCormack

---

[5] See, e.g., Calabresi, *Costs of accidents: A Legal and Economic Analysis* (1970); Posner, *Economic Enalysis of Law* (7th ed).

3

STATE OF MICHIGAN

SUPREME COURT

DEVON SCOTT BAILEY,

        Plaintiff-Appellee/
        Cross-Appellant,

v                                    No. 144055

STEVEN GEROME SCHAAF,

        Defendant,

and

T.J. REALTY, INC., d/b/a HI-TECH
PROTECTION, TIMOTHY JOHNSON,
CAPTAIN WILLIAM BOYD BAKER,
CHRISTOPHER LEE CAMPBELL,

        Defendants-Appellees,

and

EVERGREEN REGENCY TOWNHOMES,
LTD., and RADNEY MANAGEMENT &
INVESTMENTS,

        Defendants-Appellants/Cross-
        Appellees.

_____

CAVANAGH, J. (*concurring in part, dissenting in part*).

      At issue in this case is whether an apartment complex landlord owes a duty to its

tenants and invitees to respond to an imminent threat of a third party's criminal act in the

common area of the premises by calling the police. Specifically, we must decide whether

*MacDonald v PKT, Inc*, 464 Mich 322; 628 NW2d 33 (2001), applies to landlords. To

the extent that the majority holds that landlords owe their tenants and invitees the duty established by a majority of this Court in *MacDonald*, I agree. However, I respectfully disagree with the majority's analysis, and its decision to limit the holding of *Samson v Saginaw Prof Bldg, Inc*, 393 Mich 393, 409; 224 NW2d 843 (1975). In my judgment, the majority fails to sufficiently analyze the nature of the relationship between a landlord and the landlord's tenants and invitees, where that relationship defines the nature of a landlord's duty.

## I. PREMISES PROPRIETORS' DUTY TO PROTECT ANOTHER
## A. GENERAL PRINCIPLES

Generally, the law may recognize a tort duty where "the relationship between the actor and the injured person gives rise to [a] legal obligation on the actor's part for the benefit of the injured person." *Moning v Alfono*, 400 Mich 425, 438-439; 254 NW2d 759 (1977). In determining whether there is a legal obligation on the part of the actor that the law will recognize, often the question of duty will turn on a number of different factors, "including foreseeability of the harm, degree of certainty of injury, closeness of connection between the conduct and injury, moral blame attached to the conduct, policy of preventing future harm, and . . . the burdens and consequences of imposing a duty and the resulting liability for breach." *Valcaniant v Detroit Edison Co*, 470 Mich 82, 86; 679 NW2d 689 (2004) (citations and quotation marks omitted). The nature of the parties' relationship is critical in determining whether that relationship created the existence of a legal obligation because it is a basic principle of negligence law that, as a general rule, "there is no duty that obligates one person to aid or protect another." *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498-499; 418 NW2d 381 (1988), citing 2

2

Restatement Torts, 2d, § 314, p 116. A duty to protect another may nevertheless be imposed when a special relationship exists between a defendant and a plaintiff. *Id.* at 499, citing 2 Restatement Torts, 2d, § 314A, p 118.[1]

As we stated in *Williams*, the duty to protect may impose liability from passive inaction, or nonfeasance, and "[t]he common law has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff." *Williams*, 429 Mich at 498. However, *Williams* further explained that "[s]ocial policy . . . has led the courts to recognize an exception to [the general rule that there is no duty to protect another] where a special relationship exists between a plaintiff and a defendant." *Id*. at 499. This Court has also held that "[d]uty is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." *Buczkowski v McKay*, 441 Mich 96, 100-101;

---

[1] If a legal obligation exists arising out of the parties' special relationship, other inquiries remain relevant in determining whether a *particular* duty or standard of care is owed to a plaintiff. See *Murdock v Higgins*, 208 Mich App 210, 215; 527 NW2d 1 (1994), aff'd 454 Mich 46 (1997) (citations and quotation marks omitted) ("In order to determine whether a 'special relationship' giving rise to a legal duty to act exists in a particular case, this Court has held that it is necessary to balance the societal interests involved, the severity of the risk, the burden upon the defendant, the likelihood of occurrence, and the relationship between the parties. . . . Other factors which may give rise to a duty include the foreseeability of the [harm], the defendant's ability to comply with the proposed duty, the victim's inability to protect himself from the harm, the costs of providing protection, and whether the plaintiff had bestowed some economic benefit on the defendant."). See, also, Dobbs, The Law of Torts, § 317, p 859 ("Even if a duty to take reasonable [active] action is recognized, liability is by no means a foregone conclusion. The exact conduct that reasonable care would demand may vary according to the relationship and circumstances.").

3

490 NW2d 330 (1992) (quotation marks omitted), quoting Prosser & Keeton, Torts (5th ed), § 53, p 358.[2]

Despite the common law's reluctance to impose a duty to protect another, *Williams* noted that, in the past, the duty to protect may apply to a common carrier and its passengers, an innkeeper and its guests, and an employer and its employees, explaining that

> [t]he rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety. [*Williams*, 429 Mich at 499 (citations omitted).]

## B. MERCHANTS AND LANDLORDS

It is true that "Michigan courts recognize a duty of care that arises solely from the possession of land . . . ." *Kessler v Visteon Corp*, 448 F3d 326, 331 (CA 6, 2006); see also *Bertrand v Alan Ford, Inc*, 449 Mich 606, 609; 537 NW2d 185 (1995) ("Essentially,

---

[2] See, also, Harper & Kime, *The Duty to Control the Conduct of Another*, 43 Yale L J 886, 905 (1934) (stating that the policies justifying the imposition of the duty to protect "reflect the general attitude of the community; they represent for the most part the popular notions of what constitutes proper assumptions on the part of one person when dealing with another. The common law attempts to interpret these communal reactions and to crystallize them into rules of law. As business and social relations become more and more complicated, these reactions are modified on the one hand and extended on the other. This requires modification and extension of the common law. The principles governing the duty of one person to control the conduct of another have this general elasticity which characterizes other principles of tort law. . . . If . . . the relationship of the parties appears to be, for all practical social purposes, indistinguishable from the type of cases which have been included under these general divisions [of either a special relationship or special circumstances], tort law may add another cubit to the stature which it has acquired over centuries of constant growth.").

social policy imposes on possessors of land a legal duty to protect their invitees on the basis of the special relationship that exists between them."). In fact, *Williams* explained that "[o]wners and occupiers of land are in a special relationship with their invitees and compromise the largest group upon whom an affirmative duty to protect is imposed." *Williams*, 429 Mich at 499. *Williams* supported that assertion by explaining that landlords may be held liable for an unreasonable risk of harm caused by a dangerous condition of the land in the common areas of the premises, and merchants also have a duty to reasonably maintain the physical structures on their premises. *Id*. at 499-500, citing 2 Restatement Torts, 2d, §§ 343, 360, and *Johnston v Harris*, 387 Mich 569; 198 NW2d 409 (1972). Plaintiff, on the other hand, asserts that defendant landlords owed him a duty to protect against imminent third-party criminal conduct that was *not* the result of or facilitated by the landlord's failure *to maintain the physical premises*. Specifically, the duty that plaintiff seeks to impose on defendant landlords in this case is identical to the duty that a majority of this Court imposed on the defendant merchant in *MacDonald*.[3] The *MacDonald* Court, however, only considered whether the scope of a merchant's duty established in *Mason v Royal Dequindre, Inc*, 455 Mich 391; 566 NW2d 199 (1997), remained valid and did not consider the justification for the imposition of the duty itself. In *Mason*, we held that merchants owe the duty to protect a "'readily identifiable [invitee who is] foreseeably endangered'" from unreasonable risks of harm.

---

[3] I continue to adhere to my dissenting opinion in *MacDonald*. See *MacDonald*, 464 Mich at 346-358 (CAVANAGH, J., dissenting). However, my dissenting opinion is not implicated in this case because plaintiff only argues that a minimal duty, as defined by the *MacDonald* majority, applies to defendants.

*Id.* at 398, quoting *Murdock v Higgins*, 454 Mich 46, 58; 559 NW2d 639 (1997). *Mason* explained that this Court has "recognized that merchants may have a common-law duty to protect their patrons from the criminal acts of other patrons," 455 Mich at 399, citing *Manuel v Weitzman*, 386 Mich 157; 191 NW2d 474 (1971), and held that, generally, merchants have a duty to protect their invitees because of their special relationship. *Mason*, 455 Mich at 397-398, 405, citing *Williams*, 429 Mich at 498-500, and *Mason*, 455 Mich at 397 n 2, quoting 2 Restatement Torts, 2d, § 314A, p 118. See also *Mason*, 455 Mich at 398-399, quoting 2 Restatement Torts, 2d, § 344, pp 223-224.

While our prior cases involving owners and occupiers of land clearly demonstrate that merchants share a special relationship with their invitees, giving rise to the duty to protect, our caselaw is not so clear as it pertains to a landlord's duty to protect its tenants and invitees. Notably, while several Michigan cases that address the duty to protect to prevent harm to another in various circumstances have mentioned that landlords and tenants share a special relationship, we have yet to provide a justification for the duty. See, e.g., *Murdock*, 454 Mich at 55 n 11, *Dawe v Dr Reuven Bar-Levav & Assoc, PC*, 485 Mich 20, 26 n 3; 780 NW2d 272 (2010), *Holland v Liedel*, 197 Mich App 60, 63; 494 NW2d 772 (1992), and *Dykema v Gus Macker Enterprises, Inc*, 196 Mich App 6, 8; 492 NW2d 472 (1992). Moreover, it is not clear from our prior cases involving only a *merchant*'s duty to protect another from the criminal conduct of a third party that this Court has assumed that merchants and landlords have synonymous duties as premises owners. Rather, we have indicated that a landlord's relationship with its tenants may differ from a merchant's relationship with its invitees. See *Williams*, 429 Mich at 502 n 17 (explaining that landlords have *more* control over their relationships with their tenants

6

than merchants do with their invitees); *Scott v Harper Recreation, Inc*, 444 Mich 441, 452 n 15; 506 NW2d 857 (1993) (expressly declining to address whether its holding should be extended to the landlord-tenant context).[4]

Before *Williams* was decided, *Samson* recognized that a special relationship exists between a landlord and its tenants.[5] *Samson*, 393 Mich at 409. In *Samson*, a landlord of a commercial building leased office space to a mental health clinic. *Samson* upheld a jury verdict that imposed liability on the landlord for failing to protect against the harms posed by the mental health clinic's patients within the common areas of the building. *Id.* at 408-409. *Samson* reasoned that a landlord retains responsibility for the common areas of the premises that are not leased to tenants, and no one but the landlord remains responsible for those areas; thus, "[i]t is [the landlord's] responsibility to insure that these areas are kept in good repair and reasonably safe for the use of his tenants and invitees." *Id*. at 407.

However, *Samson*'s basis for upholding the landlord's duty is arguably unclear. Justice MARKMAN argues that *Samson* is distinguishable because it involved a commercial landlord, not a residential landlord, and *Samson* cited to § 314A(3) of the

---

[4] The majority asserts that *Williams* "refused to apply *Samson* to the merchant-invitee special relationship." *Ante* at 15 n 44. In my view, *Williams* simply noted *Samson*'s holding to provide a similar *comparison* between merchants to landlords, and thus evidences the fact that our caselaw may not have treated the duties of all premises proprietors as coextensive.

[5] Some Court of Appeals panels have cited *Samson* for the general proposition that landlords and tenants share a special relationship. See, e.g., *Holland*, 197 Mich App at 63.

7

Restatement, which addresses premises owners who hold their land open to the public. *Samson*, 393 Mich at 407. Also, commentators have surmised that the duty imposed in *Samson* may be characterized as arising out of the defendant's act of leasing the premises to a potentially dangerous tenant. Dobbs, The Law of Torts, § 325, p 880 n 5 (citing *Samson* and explaining that some jurisdictions impose a duty on a landlord if the landlord helped create the danger that harmed the plaintiff).[6] Thus, absent clear direction from our prior caselaw, I think that the nature of the landlord-tenant relationship must be considered in deciding whether that relationship justifies the imposition of the duty established under *MacDonald*.

## II. *MACDONALD* APPLIES TO LANDLORDS

I would hold that landlords share a special relationship with their tenants and invitees, which implicates a landlord's duty to protect against the conduct of third parties that poses an imminent and foreseeable risk of harm within the common areas of the premises. Specifically, I would hold that the minimal duty that *MacDonald* imposed on merchants applies to landlords on the basis of the landlord-tenant relationship.

Historically, the general rule against imposing liability on a person for failing to protect another may have precluded the existence of a landlord's duty to protect in light of the original nature of leaseholds. See *Trentacost v Brussel*, 82 NJ 214, 225; 412 A2d

---

[6] In my view, it is unnecessary for the majority to limit *Samson*'s holding in light of *MacDonald*'s limitation on the scope of a merchant's duty to protect its invitees. The only question that is currently before us is whether defendant landlords owed plaintiff the minimal duty as articulated by the *MacDonald* majority. See *MacDonald*, 464 Mich at 338. Moreover, as Justice MARKMAN recognizes, the duties at issue in *Samson* and *MacDonald* appear distinguishable.

8

436 (1980) ("Leases acquired the character of conveyances of real property when their primary function was to govern the relationship between landowners and farmers. Unlike the original, medieval tenant, the modern apartment dweller rents not for profit but for shelter."). Also, § 314A of the Restatement, which establishes a non-exhaustive list of special relationships that may serve the basis for the imposition of the duty to protect another, expressly includes the relationships between a merchant, or one who holds his land open to the public, and his invitees, and an innkeeper and his guests but is silent on the relationship between a landlord and tenant. 2 Restatement Torts, 2d, § 344(2), (3), and comment b, p 118.

However, in my judgment, the modern landlord-tenant relationship shares characteristics of both an innkeeper and a premises owner who holds his land open to the public. Landlords, particularly those of larger multi-complex properties, are analogous to innkeepers as to the common areas of the premises because of the reasonable expectation that landlords will provide some degree of supervision and control over the activities occurring within the common areas. See *Kline v 1500 Mass Avenue Apartment Corp*, 439 F2d 477, 482 (CA DC, 1970) (comparing a modern landlord to an innkeeper and noting that liability in the innkeeper-guest relationship may be based on the "innkeeper's supervision, care, or control of the premises"), and *id*. at 481 ("The landlord is no insurer of his tenants' safety, but he certainly is no bystander."). Further, both residential and commercial landlords open their land for their own pecuniary benefit, similar to a merchant's use of its land. Moreover, while the common areas of a residential landlord's premises may be restricted as to who may enter the land comparative to the public areas of a merchant's premises, that restriction is minimal considering that any tenant may

9

bring third parties within the common areas of the property. Because landlords share a special relationship with their tenants and invitees, just as merchants share with their invitees, I would hold that the *MacDonald* duty applies to landlords.

Notably, applying *MacDonald* to the landlord-tenant context does not contravene the central holding in *Williams*—that a premises proprietor does not have a duty to essentially provide police protection. *Williams*, 429 Mich at 501-503. In *Williams*, we considered the question "whether a merchant's duty to exercise reasonable care includes providing armed, visible security guards to protect invitees from the criminal acts of third parties." *Id*. at 500. The plaintiff in *Williams* argued that because the defendant drug store owner had not provided a security guard, as it had routinely done in the past, the defendant had breached its duty of care by not intercepting the armed robbery that occurred at the store and resulted in the plaintiff's injuries. *Id*. at 497. *Williams* held that a merchant does not have a duty to provide visible guards as a crime deterrent because that duty would amount to a duty to provide police protection. *Id.* at 501. *Williams* reasoned that a merchant is not the "insurer of the safety of his invitees" and "cannot control the incidence of crime in the community." *Id*. at 502.

As *MacDonald* recognized, "[m]erchants do not have effective control over situations involving *spontaneous and sudden* incidents of criminal activity." *MacDonald*, 464 Mich at 337 (emphasis added). However, when the facts of the case illustrate that the premises' proprietor has notice of a foreseeable risk to an identifiable tenant or invitee, the criminal activity is no longer random, as contemplated by *Williams*. See *Williams*, 429 Mich at 501 n 15 (explaining that the facts of *Williams* did not compel an application of a merchant's duty to protect its invitees against physical harm caused by

10

the intentional acts of third parties under 2 Restatement Torts, 2d, § 344, pp 223-224).

Thus, applying *MacDonald* to defendants as landlords is consistent with *Williams*'s holding, which declined to impose a general duty on a merchant to place security on the premises in the first instance to protect its invitees against *any* crime that may occur in the community. See also *Mills v White Castle Sys, Inc*, 167 Mich App 202, 208; 421 NW2d 631 (1988) (holding that *Williams*'s policy rationale did not preclude the plaintiff's negligence claim because the plaintiff argued that the defendant merchant should have summoned the police, not that the defendant should have provided police protection).

Additionally, assuming that *Scott*, 444 Mich 441, is applicable in this case, applying *MacDonald* to the landlord-tenant context does not conflict with the underlying principles of *Scott*. The *Scott* plaintiff alleged that the defendant merchant voluntarily assumed the duty to protect the plaintiff against the criminal acts of a third party by advertising that that lot was "lighted" and "guarded" and that the defendant breached that duty by failing to provide adequate security, which resulted in the plaintiff's injuries from a criminal attack. *Id*. at 449. *Scott* held that "[s]uit may not be maintained on the theory that the safety measures are less effective than they could or should have been," reasoning that "'[s]uch a policy would penalize merchants who provide some measure of protection, as opposed to merchants who take no measures.'" *Id.* at 452, quoting *Tame v A L Damman Co*, 177 Mich App 453, 457; 442 NW2d 679 (1989). *Scott* also "reject[ed] the notion that a merchant who makes property visibly safer has thereby 'increased the risk of harm' by causing patrons to be less anxious." *Scott*, 444 Mich at 451.

11

However, in this case, defendants' voluntary decision to employ security guards is not the basis for the imposition of the landlords' duty. Rather, the placement of the security guards on the premises simply serves as the means by which defendants acquired notice of Schaaf's impending criminal behavior. Indeed, if it is determined that defendants are vicariously liable for the security guards' inaction, it would be as if the defendants themselves were called on to notify the police of Schaaf's conduct.[7] Also, contrary to Justice MARKMAN's assertion, in applying *MacDonald* to defendant landlords in this case, I do not rely on the premise that tenants and invitees are lulled into a sense of safety via the placement of the security measures on the property to justify the imposition of the duty to protect on a landlord. Rather, the landlord's duty stems from the special relationship that the tenant and the landlord share, which is primarily based on the reasonable expectations that society places on the modern day landlord.

---

[7] I disagree with Justice MARKMAN's prediction that by imposing on landlords the minimal duty under *MacDonald*, landlords will completely avoid the common areas of the premises. The duty to reasonably expedite police involvement when on notice of imminent harm to an identifiable invitee or tenant is not an impossible task. In fact, the burden of this duty is slight, particularly when compared to the risk of harm, i.e., the loss of life. Weighing the burden of the duty against the desirability of avoiding the harm is consistent with the factors that this Court considers when imposing any tort duty. As a practical matter, it seems quite obvious that landlords will choose to be actively present, thereby increasing the value of their rental properties, over avoiding their properties simply because they feel it is overly burdensome to potentially have to notify the police of an imminent risk of harm of which they are aware. Such a simple act is likely something that many landlords would already feel obligated to do absent the majority's holding today and why it should be an actionable wrong to avoid this duty.

12

## III.  CONCLUSION

I would hold that *MacDonald* applies to the landlord-tenant context, which simply required defendant-landlords to call the police if they were aware of an ongoing situation that posed an imminent risk of harm to defendants' tenants and invitees.  To justify the imposition of that duty, I think that the nature of the landlord-tenant relationship must be analyzed because it is the critical factor to be considered when imposing a duty to protect another.  Further, in my view, our caselaw regarding a merchant's duty to protect its invitees from the conduct of a third party has either been silent or expressly declined to opine as to whether a landlord has a similar duty to protect its tenants and invitees.  Thus, while I agree with the majority to the extent that it holds that *MacDonald* applies to defendants in this case, I respectfully disagree with the majority's approach to this case.

Michael F. Cavanagh

13

STATE OF MICHIGAN

SUPREME COURT

DEVON SCOTT BAILEY,

       Plaintiff-Appellee/
       Cross-Appellant,

v                                                                              No. 144055

STEVEN GEROME SCHAAF,

       Defendant,

and

T.J. REALTY, INC., d/b/a HI-TECH
PROTECTION, TIMOTHY JOHNSON,
CAPTAIN WILLIAM BOYD BAKER,
CHRISTOPHER LEE CAMPBELL,

       Defendants-Appellees,

and

EVERGREEN REGENCY TOWNHOMES,
LTD., and RADNEY MANAGEMENT &
INVESTMENTS,

       Defendants-Appellants/Cross-
       Appellees.

_____

MARKMAN, J. (*dissenting*).

In *MacDonald v PKT Inc*, 464 Mich 322; 628 NW2d 33 (2001), this Court held

that a merchant has a common-law duty under limited circumstances to "aid or protect" a

patron or invitee from third-party criminal conduct. At issue in the instant case is

whether this Court should now alter the common law and impose a similar legal duty on a

residential landlord to "aid or protect" tenants and their social guests from third-party criminal conduct. Because longstanding common-law rules should not be altered absent compelling reasons for such alteration, and because the majority opinion has provided no such reasons in this case, I would continue to adhere to the general common-law rule in Michigan that a landlord has no legal duty to "aid or protect" tenants and their social guests from harm caused by a third-party's criminal conduct. Rather, traditional understandings of legal responsibility within our common law have made clear that it is the *criminal perpetrator* himself who is exclusively accountable for his own criminal conduct, not a third party.

This Court has created exceptions to our common-law rule and thereby imposed legal accountability on someone other than the criminal perpetrator only in exceptional circumstances where there is some "special relationship" in which one person can fairly be said to have entrusted himself to the control and protection of another with a consequent loss of control to protect himself. But the majority opinion has not offered any persuasive argument that either tenants or their social guests bear the same "special relationship" to a residential landlord as an invitee or a patron does to a merchant, or that there is any similar entrustment of control to the landlord and consequent loss of control by tenants or their social guests to protect themselves against third-party criminal conduct. For these reasons, I respectfully dissent.

## I. COMMON LAW

### A. NATURE OF COMMON LAW

The common law develops through judicial decisions. *Placek v City of Sterling Hts*, 405 Mich 638, 657; 275 NW2d 511 (1979). Thus, it has been described as "judge-made-law." *Id.* In particular, "[t]he law of negligence was created by common-law judges and, therefore, it is unavoidably the Court's responsibility to continue to develop or limit the development of that body of law *absent* legislative directive." *Moning v Alfono*, 400 Mich 425, 436; 254 NW2d 759 (1977). As this Court explained in *Bugbee v Fowle*, the common law "'is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes.'" *Bugbee v Fowle*, 277 Mich 485, 492; 269 NW 570 (1936), quoting *Kansas v Colorado*, 206 US 46, 97; 27 S Ct 655; 51 L Ed 956 (1907).

By its nature, the common law is not static; it adapts to changing circumstances. *Price v High Pointe Oil Co, Inc*, 493 Mich 238, 242; 828 NW2d 660 (2013). "The common law is always a work in progress and typically develops incrementally, i.e., gradually evolving as individual disputes are decided and existing common-law rules are considered and sometimes adapted to current needs in light of changing times and circumstances." *Id.* at 243. As this Court stated in *Beech Grove Investment Co v Civil Rights Comm*:

> It is generally agreed that two of the most significant features of the common law are: (1) its capacity for growth and (2) its capacity to reflect the public policy of a given era. . . .

3

\* \* \*

> "The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law, but it is a flexible body of principles which are designed to meet, and are susceptible of adaption to, among other things, new institutions, public policies, conditions, usages and practices, and changes in mores, trade, commerce, inventions, and increasing knowledge, as the progress of society may require. So, changing conditions may give rise to new rights under the law . . . ." [*Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 429-430; 157 NW2d 213 (1968), quoting 15 A CJS, Common Law, § 2, pp 43-44.]

## B. ALTERING COMMON LAW

Nevertheless, although the common law evolves, "alteration of the common law should be approached cautiously with the fullest consideration of public policy and should not occur through sudden departure from longstanding legal rules." *Price*, 493 Mich at 259. "[W]hen it comes to alteration of the common law, the traditional rule must prevail absent *compelling reasons* for change. This approach ensures continuity and stability in the law." *Id.* at 260 (emphasis added). Thus, because it is altering the common law, the majority bears the heavy burden to provide compelling reasons for its alteration and extension of the common law. In my judgment, the majority presents no compelling reasons to justify its alteration of the common law. Indeed, as set forth below, a number of persuasive reasons counsel *against* such a change. I would therefore continue to adhere to our present common-law rule, one that has endured from the outset of Michigan's statehood and that faithfully reflects what has always previously been recognized as the "'accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just between individuals in respect to private disputes[.]'" *Bugbee*, 277 Mich at 492, quoting *Kansas*, 206 US at 97.

4

## II. COMMON LAW NEGLIGENCE

To state a cause of action for recovery under a negligence theory, certain elements must be present. These elements are: (1) that defendant owed the plaintiff a legal duty; (2) the defendant breached that legal duty; (3) that plaintiff suffered damages; and (4) that defendant's breach constituted a proximate cause of the plaintiff's damages. *Hill v Sears, Roebuck & Co*, 492 Mich 651, 660; 822 NW2d 190 (2012). If any element is absent, a defendant is entitled to summary disposition.

The specific issue in this case concerns duty. In the absence of any relevant statute, the question of whether a legal duty exists in a given type of relationship is a question answered by the common law.[1] That is, this Court must determine whether under our common law defendant, a residential landlord who does not hold his land open to the public, owed plaintiff, a social guest of a tenant, a legal duty to aid or protect him from third-party criminal conduct and, if not, whether we should now alter that common law and impose such a duty.

### A. COMMON-LAW DUTY TO AID OR PROTECT ANOTHER

The general common-law rule is that a person has no legal duty to aid or protect another from harm, especially where, as here, such harm is caused by third-party criminal conduct. *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 498-499; 418 NW2d

---

[1] Although it is an ordinary responsibility of a common-law judge to decide whether there is an established legal duty in a tort case, the question before this Court is a distinct one, *to wit*, whether we should create a *new* legal duty, i.e., a new basis for a negligence action by altering the common law to impose a legal duty on a residential landlord to protect a tenant and their social guests from third-party criminal conduct.

381 (1988). Rather, the criminal perpetrator himself is exclusively responsible for such conduct and for the harm caused.[2] *MacDonald*, 464 Mich at 335 ("[I]t is unjustifiable to make merchants . . . effectively vicariously liable for the criminal acts of third parties."); *Williams*, 429 Mich at 503 ("The inability of government and law enforcement officials to prevent criminal attacks does not justify transferring the responsibility to a business owner."); *Scott v Harper Recreation, Inc*, 444 Mich 441, 452; 506 NW2d 857 (1993) ("[M]erchants are ordinarily not responsible for the criminal acts of third persons."). There are a small number of exceptions to this rule, however, and such a legal duty may arise "by operation of the common law." *Hill*, 492 Mich at 661. As the "principal steward of Michigan's common law," *Price*, 493 Mich at 258 (quotation marks and citation omitted), this Court has been highly reluctant to modify the general common-law rule and impose a legal duty on persons to affirmatively aid or protect another from harm:

> In determining standards of conduct in the area of negligence, the courts have made a distinction between misfeasance, or active misconduct causing personal injury, and nonfeasance, which is passive inaction or the failure to actively protect others from harm. The common law has been slow in recognizing liability for nonfeasance because the courts are reluctant to force persons to help one another and because such conduct does not create a new risk of harm to a potential plaintiff. Thus, as a general rule, there is no duty that obligates one person to aid or protect another. [*Williams*, 429 Mich at 498-499.]

---

[2] That one may have a *moral* duty or obligation to aid or protect is not the equivalent of having a *legal* duty to aid or protect. Thus, although a person who sees that a pedestrian is about to walk into oncoming traffic certainly possesses a *moral* obligation to intervene, a person has never been viewed as having a *legal* obligation to do so, and as a result the law will not hold him or her liable or accountable in a courtroom for the harms that occur where this moral obligation is not carried out. This is not an area of disagreement among any of the opinions in this case.

Nonetheless, we have imposed a legal duty to affirmatively aid or protect another from harm in exceptional situations in which there is some special relationship. The justification for these exceptions is that in such a special relationship, one person has entrusted himself to the control and protection of another person, with a consequent loss of control to protect himself:

> Social policy, however, has led the courts to recognize an exception to this general rule where a special relationship exists between a plaintiff and a defendant. Thus, a common carrier may be obligated to protect its passengers, an innkeeper his guests, and an employer his employees. The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety. [*Id.* at 499.][3]

As the majority and concurring opinions recognize, *Williams* sets forth what has always comprised our common-law *general rule* concerning the duty to aid or protect another, *Williams*, 429 Mich at 498-499, as well as the standard for identifying the limited range of *exceptions* to such general rule. *Id.* at 501. See *ante* at 7 ("[O]ur common law imposes a duty of care when a special relationship exists. These special relationships are

---

[3] See also *Hill*, 492 Mich at 666 ("The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself.") (quotation marks and citation omitted); *Dawe v Dr Reuven Bar-Levav & Assoc, PC*, 485 Mich 20, 26; 780 NW2d 272 (2010) (same); 2 Restatement Torts, 2d, § 314A(4), p 118 ("One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty to [aid or protect] the other.").

7

predicated on an imbalance of *control*, where 'one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself.'").

## B. COMMON-LAW PREMISES LIABILITY

As the majority and concurring opinions also recognize, our common law has long recognized that a special relationship exists between "[o]wners and occupiers of land," *Williams*, 429 Mich at 499, and those who come onto the land. Accordingly, our common law imposes particular duties on the landowner that reflect the precise nature, and are a function, of this special relationship. That is, the duty imposed is tailored to the specific manner in which the person coming onto the land has entrusted himself to the control and protection of the landowner, and has consequently lost some aspect of his ability to protect himself.[4] In *Hoffner v Lanctoe*, 492 Mich 450, 459-460; 821 NW2d 88 (2012), this Court explained the precepts of this "well-recognized" common-law duty:

> The law of premises liability in Michigan has its foundation in two general precepts. First, landowners must act in a reasonable manner to guard against harms that threaten the safety and security of those who enter their land. Second, and as a corollary, landowners are not insurers; that is, they are not charged with guaranteeing the safety of every person who comes onto their land. These principles have been used to establish well-recognized rules governing the rights and responsibilities of both landowners and those who enter their land. Underlying all these principles and rules is the requirement that both the possessors of land and those who come onto it exercise common sense and prudent judgment when confronting hazards on the land. These rules balance a possessor's ability

---

[4] When such a relationship exists, the particular duty that is imposed serves to alleviate the *particular* entrustment and consequent loss of control that exists as a result of the parties "relationship." Thus, different duties are imposed in different circumstances. See, e.g. *Takacs v Detroit United R*, 234 Mich 42, 49-51; 207 NW 907 (1926) (common carrier).

8

to exercise control over the premises with the invitees' obligation to assume personal responsibility to protect themselves from apparent dangers.

The precise duty the landowner owes depends on the exact status of the other person on the land. *Hoffner*, 492 Mich at 460 n 8. There are "three common-law categories for persons who enter upon the land or premises of another: (1) trespasser, (2) licensee, or (3) invitee." *Stitt v Holland Abundant Life Fellowship*, 462 Mich 591, 596; 614 NW2d 88 (2000).[5] The landowner owes the following duty to invitees:

> With regard to invitees, a landowner owes a duty to use reasonable care to protect invitees from unreasonable risks of harm posed by dangerous conditions on the owner's land. Michigan law provides liability for a breach of this duty of ordinary care when the premises possessor knows or should know of a dangerous condition on the premises of which the invitee is unaware and fails to fix the defect, guard against the defect, or warn the invitee of the defect. [*Hoffner*, 492 Mich at 460.]

The landowner owes the following duty to licensees:

> A landowner owes a licensee a duty only to warn the licensee of any hidden dangers the owner knows or has reason to know of, if the licensee does not know or have reason to know of the dangers involved. The landowner owes no duty of inspection or affirmative care to make the premises safe for the licensee's visit. [*Stitt*, 462 Mich at 596.]

And finally, "[t]he landowner owes no duty to the trespasser except to refrain from injuring him by 'wilful and wanton' misconduct." *Id*.

---

[5] "A 'trespasser' is a person who enters upon another's land, without the landowner's consent." *Stitt*, 462 Mich at 596. "A 'licensee' is a person who is privileged to enter the land of another by virtue of the possessor's consent." *Id*. "Typically, social guests are licensees who assume the ordinary risks associated with their visit." *Id*. "An 'invitee' is 'a person who enters upon the land of another upon an invitation which carries with it an implied representation, assurance, or understanding that reasonable care has been used to prepare the premises, and make [it] safe for [the invitee's] reception.'" *Id*. at 596-597, quoting *Wymer v Holmes*, 429 Mich 66, 71 n 1; 412 NW2d 213 (1987).

9

I agree with the majority that "the law of torts has treated landlords and merchants the same in the context of their [legal] duties to maintain the physical premises over which they exercise control." *Ante* at 7. It is correct that neither the "landlord" nor the "merchant" has ever been excepted from these duties. The legal duties to protect visitors from physical defects that apply generally to property-owners apply notwithstanding whether the person who owns the property happens to be a "merchant" or a "landlord." Indeed, I am unaware of *any* class of persons excepted by our common law from these legal duties in connection with their properties.

Drawn solely from this fact, i.e., that a merchant and landlord share a common legal duty to remedy physical defects, the majority undertakes the leap in logic that the particular duty this Court has imposed on a merchant concerning third-party criminal conduct should identically be imposed on a landlord. *Ante* at 22 ("In line with our consistent historical treatment of merchants and landlords in the context of their duty with regard to hazards in areas under their control, we apply the *MacDonald* framework to [landlords] . . . ."). I respectfully disagree with such analysis because I do not see how this unremarkable and irrelevant historical "consistency" can have any logical bearing on the instant case. This "duty with regard to hazards in areas under their control" is *universally* applied to landowners, with all landowners being treated "consistently" in this regard. However, the fact that our common law has imposed this general and well-established duty regarding *physical defects* in property on both merchants and landlords tells us nothing about whether merchants and landlords should be treated equivalently when it comes to *third-party criminal conduct*. The absence of even a perfunctory

10

analysis in this regard overlooks that the body of law that has developed concerning physical defects in property, which of course encompasses equally the property of a merchant-landowner and a landlord-landowner, has no obvious relevance in a case that concerns liability for third-party criminal conduct.[6]

Again, the majority provides little analysis regarding the current state of our common law as it relates to a *landlord's* distinctive liability for third-party criminal conduct. The majority does not compare the development of the common law as to a merchant's liability for third-party criminal conduct with that of the landlord. It does not attempt to compare or contrast the distinct circumstances of the merchant and the landlord in terms either of their control over their property or the resultant loss of control on the part of others to protect themselves from third-party criminals. And the majority does not take into consideration why a landlord should be treated like a merchant where, as here, the landlord, unlike the merchant, *has never held his land open to the public*. As discussed below, the body of common law that has developed as to a merchant's liability

---

[6] Indeed, there is a corollary to the landlord's duty with regards to hazards in the common area: the tenant bears responsibility for conditions in those parts of the leasehold under the tenant's control. See *Williams*, 429 Mich at 499 n 10 ("The landlord is not liable for injuries that occur within the boundaries of the leased premises."). Why then, under the majority opinion's analysis, would a tenant, in his area of control, not bear the same obligation as a landlord to protect others from third-party criminal conduct? Why would every landowner not owe this same duty? See *Miller v Whitworth*, 193 W Va 262, 267-268; 455 SE2d 821 (1995) (quoting *Clarke v JRD Mgt Corp*, 118 Misc2d 547, 549; 461 NYS2d 168 (1983) ("The trend toward enlarging the duty of landlords and other private parties to provide security against criminal acts, even in the absence of agreements to do so, has the potential of reaching absurd proportions. One can foresee landowners, proprietors of restaurants, stores, theaters, banks, schools and, indeed, public buildings being civilly responsible for all crimes on their premises."). I would add to the foregoing list homeowners and farmers.

11

for third-party criminal conduct-- a liability which is *premised* on the merchant holding his land open to the public-- is irrelevant to the circumstances of a residential landlord, who has *not* held his land open to the public.

## C.  THIRD-PARTY CRIMINAL CONDUCT

Again, the general common-law rule is that a person has no legal duty to aid or protect another from third-party criminal conduct and cannot be held liable for failing to render aid or protection.  Rather, the criminal perpetrator himself is exclusively responsible for such conduct and for the harm caused.

### 1.  MERCHANT LIABILITY FOR THIRD-PARTY CRIMINAL CONDUCT

Traditionally, courts have held that a merchant has no duty to aid or protect invitees from criminal conduct.  The merchant simply had the common-law duties related to physical defects on the merchant's premises.  Rather, the criminal perpetrator himself was exclusively responsible for his criminal conduct and for the harm caused.

However, as the majority correctly notes, in a line of cases beginning with *Manuel v Weitzman*, 386 Mich 157; 191 NW2d 474 (1971), overruled in part on other grounds *Brewer v Payless Stations, Inc*, 412 Mich 673; 316 NW2d 702 (1982), this Court began to gradually erode the general common-law rule by imposing new duties to aid or protect upon "merchants" and by holding such merchants liable for an increasing array of harms caused by third-party criminal conduct.  *Manuel* was a common-law negligence case in which a patron sued a "tavern keeper" for the injuries sustained when assaulted by another patron.  This Court proceeded for the first time to expand the traditional scope of common law premises liability for tavern-keeper merchants from a "duty to repair

12

physical defects" to a "duty to protect patrons from third-party criminal conduct." *Id.* at 164. From this beginning, the 'tavern keepers' common-law duty to aid or protect invitees from third-party criminal conduct was extended on a case-by-case basis to other types of merchants. See *Mason v Royal Dequindre, Inc*, 455 Mich 391, 399-403; 566 NW2d 199 (1997) (discussing such cases). Eventually, this Court clarified the scope of the now-generally-applicable merchant's duty in a line of cases that included *Williams*, *Scott*, *Mason*, and *MacDonald*. In *MacDonald*, 464 Mich at 325-326, this Court provided the following summary regarding the development that had occurred in this line of cases and articulated the scope of the merchant's legal duties:

> Under [*Mason*], merchants have a duty to respond reasonably to situations occurring on the premises that pose a risk of imminent and foreseeable harm to identifiable invitees. We hold today that the duty to respond is limited to reasonably expediting the involvement of the police and that there is no duty to otherwise anticipate and prevent the criminal acts of third parties. Finally, consistent with [*Williams*], and [*Scott*], we reaffirm that merchants are not required to provide security personnel or otherwise resort to self-help in order to deter or quell such occurrences.

This duty to aid or protect applies to merchants: "A possessor of land *who holds it open to the public* for entry for his business purposes is subject to liability to members *of the public* while they are upon the land for such a purpose . . . ." 2 Restatement Torts, 2d, § 344, pp 223-224 (emphasis added).[7]

---

[7] Although *MacDonald* rejected the argument that *Mason* adopted the *entire* "rule" set forth in § 344 and comment f to § 344 of 2 Restatement Torts, 2d, *MacDonald*, 464 Mich at 341-342, there was no indication that *MacDonald* rejected the Restatement's description of the class of people who owed this duty, or that the "merchant" duty in *MacDonald* was imposed on anyone other than those who hold property open to the

13

As discussed below, the body of common law that developed for a possessor of land who holds it open to the public for entry is inapplicable to a possessor of land who does not open his land to the public for similar entry. Indeed, in *Scott* and *Williams* this Court expressly stated that its decision did not apply with regard to "the application, in the area of landlord-tenant law, of the principles discussed." *Scott*, 444 Mich at 452 n 15; see *Williams*, 429 Mich at 502 n 17. The majority opinion provides no convincing explanation as to why a common area that is *not* open to the public should be treated in the identical fashion as a merchant's property that *is* open to the public.

## 2. LANDLORD LIABILITY FOR THIRD-PARTY CRIMINAL CONDUCT

Similarly, and in accordance with the general common-law rule, courts have historically held that a landlord has no duty to aid or protect tenants or their social guests from criminal conduct. In its analysis, the majority relies on *Samson v Saginaw Prof Bldg, Inc*, 393 Mich 393; 224 NW2d 843 (1975) as the (sole) basis of support for its conclusion that this Court has "expanded" our traditional common-law rule regarding the duty imposed on a landlord such that a landlord can be held liable for the third-party criminal conduct that occurred in this case. *Ante* at 12-13 ("[T]his Court expanded the duty of both landlords and merchants to protect their tenants and invitees from those criminal acts."). Although *Samson* is indispensable to the overall majority argument because it provides the legal basis for its conclusion that *landlords* are under a general

_____

public. Indeed, *MacDonald* clarified the common-law duty owed by this very class of people. *Id.* at 325-326.

14

duty to aid or protect tenants and their social guests from third-party criminal conduct under *existing* Michigan common law, it is easy to overlook this fact because the majority opinion devotes only a single sentence to *Samson*, despite discussing general common-law premises liability for nearly six full pages, and a *merchant's* liability for the criminal conduct of a third party for nearly five full pages. This point cannot be overstated: *Samson is the one and only case on which the majority opinion relies for its assertion that the landlord has a common-law duty to aid or protect tenants and their social guest from third-party criminal conduct under our common law.* That is, according to the majority, *Samson* recognized that a landlord and tenant have a special relationship of entrustment and control, and that the duty the landlord owes on account of this special relationship also extends to a tenant's social guests. Thus, says the majority, defendant-(landlord) owed a duty to aid or protect plaintiff (tenant's social guest) under *existing* Michigan common law and can be held liable for failing to render aid or protection.[8] The majority offers the following one sentence "analysis" of *Samson*:

---

[8] The majority opinion further makes it clear that the duty it has found under our existing Michigan common law, and then "clarified" by imposing the merchant's duty does not come from this Court's decision in *Johnston v Harris*, 387 Mich 569; 198 NW2d 409 (1972), which, according to the majority opinion, concerned "the landlord's duty to repair physical defects in common areas." *Ante* at 19 n 57 ("We do not address the status of [*Johnston*], because it is not implicated under the facts of this case."). The concurring opinion likewise agrees that this case does not concern the type of physical defects that were at issue in *Johnston*. *Ante* at 5 (concurring opinion) ("[P]laintiff . . . asserts that defendant landlords owed him a duty to protect against imminent third-party criminal conduct that was *not* the result of or facilitated by the landlord's failure to *maintain the physical premises*."). The Court of Appeals reached this same conclusion. *Bailey v Schaaf*, 293 Mich App 611, 640; 810 NW2d 641 (2011) ("[T]his case clearly does not involve a *condition on the land* that placed Bailey at a heightened risk of harm at the

15

Similarly, in [*Samson*], this Court applied the same theory of liability [that it applied in *Manuel*] to a commercial landlord that leased office space to an outpatient mental health clinic but that had failed "to provide some security measures or warnings for the safety of its tenants and visitors . . . ." [*Ante* at 14 (citation omitted).]

Because the majority never explains what it believes to be the theory of liability in *Manuel*, it is unclear what exactly it believes to be the "theory of liability" this Court applied in *Samson*.[9] In any event, this Court made abundantly clear in *Samson* that it was imposing a duty on the defendant only because he had held his land open to the public.[10] Consequently, *Samson's* "theory of liability" is utterly inapplicable here because defendant did not do the same.

hands of third parties.") (emphasis in original). I agree that *Johnston* as a genuine premises-liability case is distinguishable from the instant case.

[9] To the extent the majority is asserting that the "theory of liability" was a function of the duty owed by an owner or occupier of land, i.e., general premises liability, one might wonder why the majority opinion gives no consideration to the open-and-obvious-danger doctrine, a doctrine closely enmeshed with premises liability. Under this doctrine¸ a landlord's (or any other landowner's) duty to protect others from dangerous conditions "does not extend to conditions from which an unreasonable risk cannot be anticipated or to dangers so obvious and apparent that an invitee may be expected to discover them himself." *Williams*, 429 Mich at 500. It appears that the third-party criminal conduct at issue here may well have been so obvious and apparent that an invitee may have been expected to discover them himself. Indeed, the tenants appear to have quickly and easily discovered the danger.

[10] Clearly, landlords and tenants have the special relationship of entrustment and consequent loss of control that exists between "owners and occupiers of land" and those who come onto the land, and thus a landlord owes a tenant the traditional common-law duties that pertain to address the entrustment and consequent loss of control that exist under that *particular* special relationship. See n 5. But this landlord and his tenant's social guest do not have the *particular* special relationship of entrustment and consequent loss of control that was the source of the *Samson* defendant's duty to aid or protect the plaintiff from third-party criminal conduct. Having a special relationship in one realm does not signify that parties must have a special relationship in every realm.

16

In *Samson*, a clinic that treated mental-health patients, including those from the Ionia State Prison, leased space on the fourth floor of a commercial office building from the defendant, the owner of the building. Tenants in the building told the defendant's representatives that they were afraid of the clinic's patients, who had to use the stairs and elevators to reach the clinic, but the defendant took no action. The plaintiff, a secretary employed by a lawyer who leased an office on the fifth floor, was attacked by one of the clinic's patients in an elevator while on her way to a coffee shop located on the first floor. The plaintiff claimed that the defendant was negligent by failing to take appropriate actions to ensure that the common area of the building were reasonably safe, and the jury awarded damages. The Court of Appeals affirmed. On appeal, this Court held that it was the responsibility of the defendant to ensure that the common area of the building were reasonably safe, and that a jury question had been presented as to whether the defendant's failure to undertake precautionary security measures in relation to the clinic constituted a breach of its legal duty to aid or protect the plaintiff.

Regarding the special relationship that provided the source of the defendant's duty, this Court explained:

> Defendant leased its premises to the Mental Health Clinic. For this act, by itself, our law imposes no liability and indeed should impose none. Whether or not the landlord retains any responsibility for actions which occur within the confines of the now leased premises is not now before this Court and need not be answered. It would appear, however, that he would not retain any responsibility for such actions except in the most unusual circumstances. However, the landlord has retained his responsibility for the common areas of the building which are not leased to his tenants. The common areas such as the halls, lobby, stairs, elevators, etc., are leased to no individual tenant and remain the responsibility of the landlord. It is his

17

responsibility to insure that these areas are kept in good repair and reasonably safe for the use of his tenants and invitees.

The existence of this relationship between the defendant and its tenants and invitees placed a duty upon the landlord to protect them from unreasonable risk of physical harm. *2 Restatement Torts, 2d, § 314A(3).* [*Samson*, 393 Mich at 407.]

As can be seen from the above quotation, this Court made it clear that its decision was based on 2 Restatement Torts, 2d, § 314A(3), p 118, which provides:

A possessor of land who holds it *open to the public* is under a similar duty to [aid or protect] members of the public who enter in response to his invitation. [Emphasis added.][11]

As subsection (3) makes clear, the duty imposed on the owner of the commercial office building to aid or protect the attorney's secretary was not based on the owner being a "landlord" and leasing office space to commercial tenants, one of whom employed the plaintiff. Indeed, a "landlord-tenant" relationship could *not* have been the source of the defendant's legal duty to aid or protect the plaintiff because the plaintiff and the defendant did not even have a "landlord-tenant" relationship.[12] That is, the defendant

---

[11] *Samson* cited 2 Restatement Torts, 2d, § 314A(3) as the sole support for its concluding sentence in the relationship and duty section, the very same sentence in which it held that that there was a relationship and duty. *Samson*, 393 Mich at 407. That this Court chose to reference a *single* citation, and to cite a specific *subsection* can be nothing other than a deliberate decision. To hold then that this Court was not genuinely applying the only legal rule that it actually cited in support of its decision is, to say the least, a considerable stretch.

[12] Black's Law Dictionary (9th ed), defines "landlord" as "[o]ne who leases real property to another," and "tenant" as "[o]ne who holds or possesses lands or tenements by any kind of right or title." *Id.* It defines "landlord-tenant relationship" as:

18

was *not* the plaintiff's landlord and the plaintiff was *not* the defendant's tenant. Rather, the only relationship the plaintiff had with the defendant was that the plaintiff was employed as a secretary by one of the defendant's tenants.

However, what is most obvious and pertinent about the *Samson* analysis is that the special relationship, and attendant legal duty to aid or protect, was a function of the defendant holding his land *open to the public*.[13] Thus, in the same way that the owner of a mall leases individual storefronts to commercial tenants and invites the public into the

> The legal relationship between the lessor and lessee of real estate. The relationship is contractual, created by a lease (or agreement for lease) for a term of years, from year to year, for life, or at will, and exists when one person occupies the premises of another with the lessor's permission or consent, subordinated to the lessor's title or rights. [*Id.*]

[13] The concurring opinion states:

> Justice MARKMAN argues that *Samson* is distinguishable because it involved a commercial landlord, not a residential landlord, and *Samson* cited to § 314A(3) of the Restatement, which addresses premises owners who hold their land open to the public. Also, commentators have surmised that the duty imposed in *Samson* may be characterized as arising out of the defendant's act of leasing the premises to a potentially dangerous tenant. Dobbs, The Law of Torts, § 325, p 880 n 5 (citing *Samson* and explaining that some jurisdictions impose a duty on a landlord if the landlord helped create the danger that harmed the plaintiff). [*Ante* at 7-8 (concurring opinion).]

First, although *Samson* involved a commercial landlord, this Court made it clear that it was imposing a duty on the defendant not because he was a commercial landlord but because he held his land *open to the public*. Second, regarding the commentator's theory of *Samson*, this Court went out of its way to make it clear that this was *not* the basis for its decision, stating:

> Defendant leased its premises to the Mental Health Clinic. For this act, by itself, our law imposes no liability and indeed should impose none. [*Samson*, 393 Mich at 407.]

19

common area over which the owner retains control (e.g., walkways, restrooms, escalators), the defendant in *Samson* leased the individual offices to commercial tenants and invited the public into the common area over which it retained control. According to 2 Restatement Torts, 2d, § 314A(3), which, again, constituted the *only* stated legal basis for our decision in *Samson*, the owner has a legal duty to aid or protect invitees because it has held these areas *open to the public*, not because the owner happened also to be a "landlord" who leased property to commercial "tenants" in the building.

In *contrast*, and particularly relevant to this case, the common area of a residential apartment building is not open to the public, nor is the general public invited to gather there. Whether a residential common area lies within an expansive apartment complex or within a large house converted into apartments, the world is not invited into these areas. Rather, the common area of an apartment building is simply not a place of public use or gathering from which a landlord, in the same manner as a merchant or mall owner, profits from the presence of the very public that has been invited onto his property, and therefore must in fairness share in the legal risks to which public invitation may give rise. The common area of a residential apartment is by its nature private and open only to those persons invited onto the property. It is to all significant purposes the equivalent of a *home*, in which residents are generally responsible for their own protection from third-party criminal conduct. Absent some compelling explanation as to how the differences between a home and an apartment impose on residents of the latter some real diminution in the ability to protect oneself from such conduct, the legal duty to aid or protect that this Court recognized in very different circumstances in *Samson* on the basis of Restatement,

§ 314A(3) is inapplicable to this case, and there is no other decision of this Court that stands for the same proposition that the majority opinion erroneously attributes to *Samson*.

The majority fails to account for this Court's specific citation in *Samson* to Restatement, 2d, § 314A(3). By failing to recognize that the legal duty at issue in *Samson* was predicated on the special relationship set forth in § 314A(3), the majority is left free to determine at its own discretion that the legal duty there was predicated on some other special relationship . In other words, by not giving consideration to the exclusive reliance in *Samson* placed on Restatement, § 314A(3), the majority is able to characterize the special relationship in *Samson* as it sees fit and to assert that the legal duty identified in that case was imposed on the basis of *that* special relationship, rather than on the basis of the special relationship that, in fact, was expressly at the heart of *Samson* and that was grounded on Restatement, § 314A(3). Although in *this* case, the majority deems that a "landlord-tenant" relationship constituted the source of the legal duty to aid or protect imposed in *Samson*, in the next case it could just as easily identify such legal duty as reposing in a "building owner-elevator rider" special relationship, or a "building owner-lawyer's secretary" special relationship, as the source of a defendant's legal duty to aid and protect. Whatever check or constraint can reasonably be derived from Restatement, § 314A(3) on the scope of exceptions to the general rule in Michigan that there is no legal duty to aid or protect another from the criminal conduct of third parties has been eroded by the free-form analysis of the majority opinion.

21

Given that *Samson* is inapplicable, the majority opinion lacks support for its assertion that the landlord here had a common-law duty to aid or protect a tenant's social guest from third-party criminal conduct under the *existing* common law.[14] Rather, the majority is *altering* the common law by creating a new special-relationship exception to the common-law rule that there is no legal duty to aid or protect another from third-party criminal conduct and thus imposing on "landlords" whose property is not open to the public, new legal responsibility and accountability for the criminal conduct of third parties.[15]

---

[14] Even if our decision in *Samson* had been predicated on the existence of a landlord-tenant special relationship, there is no such special relationship in the instant case because plaintiff, again, was not a tenant. The majority supplies no explanation as to why a landlord owes a tenant's social guest the same duty it owes the tenant himself, with whom it has a landlord-tenant relationship. The majority merely labels the tenant's social guest an "invitee" without any further explanation. However, "[t]ypically, social guests are licensees who assume the ordinary risks associated with their visit." *Stitt*, 462 Mich at 596; see *Jack v Fritts*, 193 W Va 494, 499; 457 SE2d 431 (1995) (holding that a landlord owes no duty to a tenant's social guest to protect that guest from third-party criminal conduct because such a duty is predicated on the existence of a landlord-tenant special relationship and the landlord and tenant's social guest lack any such relationship).

[15] Moreover, the majority provides no definition of "landlord." It is thus unclear exactly who is now subject to this new duty and legal liability. Is a "landlord" "[o]ne who leases real property to another?" Black's Law Dictionary; see n 15. Or does the statutory definition of "landlord" provided in this state's Landlord Tenant Relationship Act apply? See MCL 554.601(c) ("'Landlord' means the owner, lessor, or sublessor of the rental unit or the property of which it is a part and, in addition, means a person authorized to exercise any aspect of the management of the premises, including a person who, directly or indirectly, acts as a rental agent, receives rent, other than as a bona fide purchaser, and who has no obligation to deliver the receipts to another person."). Or perhaps some other definition? The majority does not say. If a child moves home after college and his parents charge him $100 a month to "rent" a room, do the parents now owe this new "landlord" duty to their child and all of his or her guests? Is a person who rents out his basement apartment now subject to this new legal duty? What of the owner of a duplex

### 3.  "CLARIFYING" *SAMSON* DUTY

After firstly concluding erroneously that defendants are subject under our common law to *Samson*, the majority then, secondly, proceeds to transform the *Samson* duty as a function of "clarifying" it, and then, thirdly, it effectively overrules *Samson* by "limiting" it.  The majority states that although *Samson* "implied some duty for a landlord . . . to take prophylactic measures to prevent third parties' criminal acts *before* they are imminent, it did not specifically articulate the measures that a landlord . . . must take to obviate the hazard of third parties' criminal acts."  *Ante* at 14.  The majority states that the "implied" duty in *Samson* was "amorphous," *ante* at 14, and then "clarifie[s] . . . the scope of the [*Samson*] duty,"  *ante* at 16, by imposing onto a landlord the entire body of common law that developed as to a *merchant*'s liability for third-party criminal conduct. See *ante* at 19 ("the duty clarified today").

This "clarified" duty imposed from the line of common-law decisions concerning a *merchant's* liability for third-party criminal conduct has no bearing on the question of what duty, if any, should be imposed on the *landlord*, at least absent compelling justification.  Indeed, the majority adopts this merchant's duty despite the fact that the landlord in this case bears little resemblance to a merchant, and despite the fact our common law has in no way treated a merchant and a landlord in an equivalent fashion

---

who lives in one half and rents out the other?  Is he subject to this new legal duty?  All that is certain is that the present opinion of the Court will yield new litigation, new creative theories of legal liability, higher insurance premiums on landlords, and that some unknown number of landlords will ultimately be held legally responsible and accountable in the courtroom for the criminal conduct of third parties.

when it comes to third-party criminal conduct. Even if one were to overlook that in this case there is no duty to be "clarified" because the *Samson* duty does not apply to landlords, the "clarified" duty applied in lieu of the *Samson* duty is in fact a *new* duty that this Court has never before imposed. Notably, if the majority's "now-clarified" duty were to be applied in *Samson*-- the very case on which the majority relies for the legal duty that it is now "clarifying"-- *Samson* would be effectively overruled because there would be no factual basis for upholding the jury verdict that imposed liability on the landlord.[16] Despite this, the majority still fails to acknowledge that it is altering the common law of this state, opining only that "[t]o the extent this holding . . . conflict[s] with *Samson*, we limit *Samson* to the duty clarified today and in *MacDonald*." *Ante* at 19.

Moreover, although the majority acknowledges that we have imposed a legal duty to affirmatively aid or protect only in exceptional circumstances in which there is some

---

[16] The duty imposed in *Samson* required the landlord to "investigate" and take "available preventative measures" where tenants "voiced their concern and uneasiness over the [mental patients'] use of the elevators and stairwells of the building." *Samson*, 393 Mich at 404, 411. In contrast, under the "clarified" *Samson* duty-- i.e., the *MacDonald* duty-- a landlord has no obligation to "investigate" or "take any preventative measures" with regard to third-party criminal conduct. The landlord's only duty is to "make reasonable efforts to expedite police involvement," *ante* at 20, when confronted with a "specific situation occur[ring] on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee," *MacDonald*, 464 Mich at 335. The victim in *Samson* was robbed in seclusion, in an elevator. *Samson*, 393 Mich at 398-399. When the elevator "reached the ground floor, [the third-party criminal] ran away." *Id.* at 399. The landlord in *Samson* thus lacked notice of third-party criminal conduct sufficient to trigger his *MacDonald* duty to call the police. That is, he had no notice whatsoever that a crime was occurring in the elevator. See *ante* at 8 n 6 (concurring opinion) ("[T]he duties at issue in *Samson* and *MacDonald* appear distinguishable.'"").

24

special relationship, it fails to explain how this test has been met here and how the "now-clarified" duty it imposes is designed to mitigate against the consequences of the particular entrustment and consequent loss of control that exists under these parties' special relationship. Before legal responsibility and accountability for third-party criminal conduct is apportioned and extended beyond the actual criminal perpetrator himself, this Court is obligated under its own "control and protect" standard to show clearly how: (a) a person can fairly be said to have *entrusted* himself to the control and protection of another; (b) such entrustment was *reasonable*; and (c) as a result of such entrustment, there has been a *consequent loss of control* by that person to protect himself. The majority opinion not only does none of these things before redefining the common-law legal duties in this case, but it also fails to answer what is invariably the ultimate and practical inquiry in a case in which the common law is to be altered-- what has changed in our society, what has evolved in our customs and practices and values, what is different as to our expectations in terms of the law, that justifies imposition of a legal duty in 2013 on landlords to aid or protect tenants given that there has been no such legal duty in the past 176 years of Michigan's common law?

I have no doubt that this Court possesses the legal *authority* to undertake today's decision, and I can understand how reasonable people can differ from my own viewpoint as to the *wisdom* of the majority's course of action, but this Court today undertakes something that is significant and consequential when it redefines the *legal consequences of criminal conduct* and establishes new legal duties in that regard within our common

25

law. This Court, in my judgment, owes a far more thorough explanation in support of why this redefinition of our legal rights and responsibilities has now become necessary.

Although I certainly agree with the majority that a landlord has a substantially higher degree of control over the *physical structures* and *architecture* of the common area, I fail to follow how that higher degree of control, which is already accounted for by the duties imposed under traditional common-law premises liability principles, has any bearing on whether tenants or their social guests have entrusted themselves to the "control and protection" of the landlord and, in so doing, have diminished or compromised their own ability to protect themselves against *third-party criminal conduct*. According to the majority opinion, "as a matter of law, the duty to respond requires only that a landlord make reasonable efforts to expedite police involvement." *Ante* at 20. Making reasonable efforts to expedite police involvement is apparently all that is required by the majority's rule. Per the majority, the landlord is not required to modify or repair the common area in any way that makes criminal conduct less likely, he is not required to take control of these areas and actively root out criminal conduct that may be occurring or that is imminent, and he is not required to institute surveillance or any other particular security precaution. If he were *require*d to do any of these things, I might agree with the majority opinion that the landlord would be in the better, if still not exclusive, position to undertake these measures as a function of his control over the common area. But by the majority's holding, the landlord is not obligated to do such things, because that is not what the *MacDonald* legal duty requires. Indeed, the landlord is not even required to make himself available to tenants so that he may become better

aware that a third party's criminal conduct may be imminent. In light of the specific legal obligations, and nonobligations, imposed on the landlord via *MacDonald*, how precisely does the landlord's greater control over the common area place the landlord in a better position to "make reasonable efforts to expedite police involvement?" And how precisely does the landlord's greater control over the common area have *any* bearing whatsoever as to whether the landlord or tenants and their social guests are in a better position to undertake such efforts? Where a third-party criminal threat arises, and where the landlord becomes aware of that threat, what exactly is the relevance of the landlord's control over the common area of the property? How does this control assist the landlord, or hinder the tenant, in attempting to "expedite police involvement." The majority opinion does not say. To take into consideration only a single factor, would not the development of cellular-telephone technology over the past generation render tenants in 2013 even more capable of expediting such police involvement than tenants in 1983, 1903 or 1843?[17]

---

[17] The concurring opinion contends that there is a "reasonable expectation that landlords will provide some degree of supervision and control over the activities occurring within the common areas." *Ante* at 9 (concurring opinion). However, it does not say how "provid[ing] some degree of supervision and control over the activities occurring within the common areas" is any different than "expecting" the landlord to provide a safer environment than that encountered in the community-at-large, the very argument this Court soundly rejected in *Williams*, 429 Mich App at 502:

> [A]lthough defendant can control the condition of his premises by correcting physical defects that may result in injuries to its invitees, it cannot control the incidence of crime in the community. Today a crime may be committed anywhere and at any time. To require defendant to provide armed, visible security guards to protect invitees from criminal acts

27

Furthermore, the tenant who believes that criminal conduct is imminent is free to make reasonable efforts on his own and to expedite police involvement, and is in no way prevented from taking such an action as a result of the landlord's higher degree of control over the common area. The tenant is in closer proximity to his home, a presumed place of safety to which he and his guests may retreat, and again is in no way prevented from undertaking such actions as a result of the landlord's higher degree of control over the common area. Indeed, in this very case, the security guards hired by the landlord themselves had no obvious place of safety or retreat.[18] Even if the landlord happens to be

> in a place of business open to the general public would require defendant to provide a safer environment on its premises than its invitees would encounter in the community at large. Defendant simply does not have that degree of control and is not an insurer of the safety of its invitees.

Even if we assume that some tenants or their social guests may "expect" the landlord to "provide some degree of supervision and control," no explanation is provided for why such an "expectation" is reasonable or would cause responsible persons to be diminished or compromised in their own ability to protect themselves. In fact, this Court has explicitly rejected liability on the basis of a person assertedly being "induced to relax his normal vigilance," *Scott* 444 Mich at 451, yet such speculation is exactly what underlies the tenant behavior that the majority presents as justification for imposing greater legal duties on the landlord. Indeed, although a property owner can always control the condition of his premises by correcting physical defects that may result in injuries, he cannot always affect, much less control, the incidences of crime within his community. The inability of government and law enforcement officials to abolish all violent crime does not justify transferring liability to a landlord or to the security company that the landlord hires. See *Williams*, 429 Mich at 503.

[18] The security guards did not possess keys to the landlord's office/private area. One guard had a personal cell phone, and the other had no phone. Thus, only one even possessed the present ability to contact the police. Moreover, both guards lacked the threshold authority the majority deems essential to its imposition of a duty on the landlord; neither had any right to alter or control any physical structure in the common area.

actually present within the common area, the tenant does not lose any ability to protect himself as a consequence of the landlord's higher degree of control.

## 4. *MACDONALD* DUTY AND LANDLORDS

Not only, I believe, has the majority opinion failed to present "compelling reasons" for altering the common law, but the status quo represents responsible and rational public policy, a consideration crucial to this Court's common-law decisionmaking. Indeed, extending the *MacDonald* duty advanced by the majority opinion is contrary to sound public policy, in my judgment, for several reasons.

Presence-- First, to reemphasize a point made earlier, there is an important distinction between the merchant in *MacDonald* and the landlord in this case in that the merchant (or his employees and agents) almost always has to be physically present on the business premises to serve customers and otherwise conduct business. By contrast, the landlord (and his employees or agents) has no similar reason to be physically present. This is particularly true of landlords of more modest rental properties. Indeed, a landlord may have no reason at all to visit a common area of an apartment building for weeks or months on end, and even large rental properties may have their leasing and management offices off-site, far away from the common area of the actual apartment building. In other words, the merchant's presence on the premises of his property is largely obligatory, whereas the landlord's presence in the common area of his property is largely discretionary.

As a result, imposing the *MacDonald* duty on landlords will almost certainly encourage at least some landlords to take greater care in *avoiding* the common area since

29

it is their largely discretionary presence in such area that apparently constitutes the only means by which the landlord can gain the awareness of criminal conduct in the first place that would give rise to the *MacDonald* duty.[19]  In other words, a landlord who provides security guards or video cameras or alarms in the common area will ironically be exposed to a *greater* risk of legal liability for the criminal conduct of third parties than will a landlord who simply *fails* to take take such precautions.  As a consequence, imposing the *MacDonald* legal duty can only have the effect of disincentivizing and discouraging some landlords, especially those in the high-crime neighborhoods most in need of vigilance against third-party criminal conduct, from instituting the very security measures that will trigger this duty in the first place.  Compare, *MacDonald*, 464 Mich at 341 (asserting that the dissent's rule in that case, which would have allowed the character of the merchant's business and an assessment of whether prior similar conduct had occurred on the premises to be considered, "would unfairly expose merchants in high-crime areas to excessive tort liability and increase the pressure on commercial enterprises to remove themselves from our troubled urban and high-crime communities").  Imposing this new liability on landlords will do nothing to promote safety for the low-income tenants in

---

[19] The majority opinion clearly recognizes that such awareness is crucial:

> Only when given notice of [a situation occurring on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable tenant or invitee] is a duty imposed on a landlord.  *Notice* is critical to the determination whether a landlord's duty is triggered; without notice that alerts the landlord to a risk of imminent harm, it may continue to presume that individuals on the premises will not violate the criminal law.  [*Ante* at 18-19.]

high-crime neighborhoods who are the most in need of protection. Instead, it is likely to harm these very individuals.

Disincentives-- Second, imposing the *MacDonald* legal duty on landlords runs afoul of the policies underlying this Court's decision in *Scott*, in which this Court explicitly declined to adopt a policy that "would penalize merchants who provide some measure of protection, as opposed to merchants who take no such measures." *Scott*, 444 Mich at 452 (quotation marks and citation omitted). Because only the landlords who provide security in the common area will face potential liability under *MacDonald*, the majority's new legal duty will penalize precisely those landlords who "provide some measure of protection." The landlords who do so will be held to a higher legal duty than those who do not, and those landlords who are the most compelled to undertake such protection as a result of high levels of criminal conduct within the neighborhoods in which their properties are located will be the hardest hit by potential lawsuits. Clearly in this case, the defendants' provision of security guards is the only thing that gives rise under the majority opinion to potential legal responsibility for third-party criminal conduct.

False Alarms-- Third, imposing the *MacDonald* duty on landlords will result in a considerable increase of "false alarm" calls to police, since failure to call the police is the principle step landlords must take to avoid liability. No landlord will risk exercising any judgment if he becomes aware by any means of a problem arising on his property-- an unidentified person, a broken window, an unaccounted-for piece of personal property, a nearby fracas, or anything at all that might be viewed in hindsight as having created a

31

"specific situation occur[ring] on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee," *MacDonald*, 464 Mich at 335. An "identifiable invitee" is a person who is within the "range of risk of harm created by [the criminal's] conduct." *Ante* at 22; see n 21. The mere fact that a crime later occurs will almost always allow one to draw the conclusion, after-the-fact, that there was a specific situation occurring on the premises that should have prompted a reasonable person to recognize a risk of imminent harm to an identifiable invitee. As the instant case amply demonstrates, the relative costs and benefits of *not* promptly communicating with the police under these and other circumstances are simply not compatible with the exercise of reason and judgment in deciding when to call the police. Call the police and there may be no liability at all; fail to call the police and you too can walk in the shoes of defendants in this case. Repeated "false alarms," and "crying wolf" will increasingly burden our state's police emergency systems, with all the attendant decline in efficient and timely response that such unnecessary calls can be expected to produce.

Litigation-- Fourth, imposing a new legal duty on landlords will give rise to more litigation. Concerning the specific legal duty to aid or protect, there will certainly be litigation concerning: (a) whether the landlord in a sufficiently timely manner recognized the arising of a "specific situation occurring on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee[;]" (b) whether the landlord's efforts to expedite police involvement were reasonable; (c) whether the landlord informed the police of the specific situation in a sufficiently timely

32

manner; (d) whether the landlord informed the police of the specific situation in a manner thoroughly describing its circumstances and communicating its urgency; (e) whether the landlord acted reasonably in his estimation of who constituted a potentially vulnerable "identifiable invitee;" (f) whether the landlord was sufficiently proactive in acquiring knowledge concerning the specific situation; (g) whether such security measures as were employed by the landlord, such as 24-hour surveillance videos, were thoroughly and conscientiously monitored; and (h) whether security guards employed by the landlord acted responsibly in all facets of their conduct. And, of course, inevitably over time, there will be the litigation to urge expansion of the *MacDonald* duty to contemplate security precautions the landlord *should* have undertaken that might have forestalled criminal conduct from occurring in the first place, requiring some evaluation of the *probability* of future criminal conduct on the basis of an analysis of *past* occurrences of such conduct within the relevant neighborhood. See *MacDonald*, 464 Mich at 343-344 (discussing this "relatedness test"); *id*. at 351-352 (CAVANAGH, J., dissenting). Indeed, whereas *MacDonald* was the product of an evolution of merchant-liability cases occurring over the course of three decades, the majority's decision today, imposing for the first time the same legal duty on the landlord, may well represent merely the first stage in what will surely become a similar common-law evolution over the next three decades.

Accountability-- Finally, I simply do not believe that our common law is advanced when it is slowly, and step-by-step, transformed from a legal system grounded in traditional notions of personal responsibility, in which *criminal perpetrators* are fully and

exclusively responsible for their own behavior, into a system in which "special relationships" are increasingly employed as vehicles by which to apportion to assorted classes of *non-criminal actors*-- in this instance, a residential landlord-- financial accountability for the consequences of criminal conduct.[20]

## III. CONCLUSION

The common-law analysis of the majority opinion is flawed, in my view, for the following reasons:

(1) The majority opinion grounds its analysis on a single decision of this Court, *Samson*, that has been transformed from a decision in which a

---

[20] Even if I were to agree that the *MacDonald* duty should be imposed on landlords, I would still disagree with the majority that we are positioned to conclude that plaintiff constituted an "identifiable invitee." The provenance of the "range of risk of harm created by the criminal's conduct" test articulated by the majority opinion is unclear. No case is cited in support of this standard. However, such a test is not set forth in *MacDonald*, and it seems largely tautological. That is, a victim harmed by criminal conduct would seemingly by that fact alone be "within the range of risk of harm created by" that criminal conduct or else the victim would not have become a victim in the first place. If that is the test, I hardly see where reasonable minds could ever differ on this point. Compare, *MacDonald*, 464 Mich at 338 ("Whether an invitee is readily identifiable as being foreseeably endangered is a question for the factfinder if reasonable minds could differ on this point.").

Under *MacDonald*, there is no duty "until a specific situation occurs on the premises that would cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee." *Id*. at 335. In my view, the "specific situation" here is not Schaaf brandishing a gun in the common area, but the tenant earlier informing the security guards that Schaaf was engaging in such conduct. The critical question thus is whether that "specific situation"-- the tenant so-informing the security guards-- would "cause a reasonable person to recognize a risk of imminent harm to an identifiable invitee." The majority opinion's conclusion that plaintiff constituted an "identifiable invitee" presupposes that the security guards immediately recognized a situation occurring in the common area that posed a risk of imminent and foreseeable harm to plaintiff. However, whether this is true or not would ordinarily pose a question of fact for the jury. *Id.* There is more than a little benefit-of-hindsight analysis in this regard.

34

legal duty was expressly predicated upon the fact that a commercial building owner held a property open to the public into a decision purportedly predicated on a previously nonexistent "special relationship" imposing on a landlord a legal duty to aid and protect tenants with regard to third-party criminal perpetrators;

(2) The majority opinion then takes the landlord duty it has erroneously imported from *Samson* and proceeds, as a function of "clarifying" *Samson*, to *replace* this nonexistent duty with the distinct and unrelated merchant duty drawn from another decision of this Court, *MacDonald*;

(3) The majority opinion then justifies this "clarification" on the basis of the unremarkable and irrelevant fact that neither landlord nor merchant has been excepted from the general premises-liability rules that apply to *all* owners of *all* types of real property;

(4) The majority opinion provides no compelling reason, as it is obligated to do before altering the common law, for imposing *any* new legal duty on a landlord to protect tenants against third-party criminal conduct, much less compelling reasons why a landlord whose property is *closed* to the public should bear legal duties *identical* to those of a merchant whose property is held *open* to the public;

(5) The majority opinion engages in no assessment of public policy considerations as a precondition to its alteration of the common law, including most significantly the merits of its further departure from the general common-law principle that it is the criminal perpetrator who is exclusively accountable for his own criminal conduct, not a third-party;

(6) The majority opinion does not explain how there has been "entrustment" of control to the landlord by tenants, and/or consequent loss of control by tenants, with regard to their protection from third-party criminal conduct, or how the specific legal duties imposed on a landlord by the majority opinion effectively mitigate against the consequences of such entrustment and/or consequent loss of control; and

(7) The majority opinion also does not explain why the landlord-tenant "special relationship" extends to a tenant's social guests.

Furthermore, the majority opinion fails to satisfy its burden of demonstrating "compelling" reasons for why the common law that has always existed in this state

35

should now be altered by further apportioning among those who have perpetrated *no* criminal conduct, legal accountability and responsibility for the harms caused by third parties who *have* perpetrated such conduct. Indeed, there are a number of compelling reasons in support of maintaining the present rule that there is no legal duty to aid or protect another from third-party criminal conduct unless a special relationship has been established in which a person can be said to have entrusted himself to the control and protection of another person with a consequent loss of control to protect himself. The majority has not offered any persuasive argument that either tenants or their social guests bear the same special relationship to a residential landlord as an invitee or a patron does to a merchant, or that there is any similar entrustment of control to the landlord, and consequent loss of control by tenants or their social guests to protect themselves against third-party criminal conduct. Accordingly, I would reverse the Court of Appeals and reinstate the trial court's judgment dismissing plaintiff's claim.


Stephen J. Markman


36